DECLARATION OF NANDAN M. JOSHI

EXHIBIT 2

**Amtrak Consumer Arbitration Agreement**
**Submitted 12/11/18 (to be effective January 6, 2019)**

## Terms & Conditions

These Terms and Conditions contain a binding **Arbitration Agreement** below. Please read the Arbitration Agreement carefully because it applies mutually to You and Amtrak and requires that you resolve claims and disputes with Amtrak on an individual basis through arbitration and not by way of court or jury trial. By purchasing a ticket for travel on Amtrak, You are agreeing to these Terms and Conditions and agreeing to the Arbitration Agreement.

## Arbitration Agreement

Mutual Agreement to Arbitrate ("Arbitration Agreement"). This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration. Amtrak and Customer (on behalf of yourself and any individuals for whom you purchase tickets, including, without limitation, family members, minor passengers, colleagues and companions (collectively "You" or "Your"), AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad, based upon or related to: these Terms and Conditions, breach of contract, tort claims, common law claims, Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, any personal injuries (including, but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary or punitive damages arising out of or related to any personal injury), and any claims for discrimination and failure to accommodate, shall be decided by a single arbitrator through binding arbitration and not by a judge or jury. Except with respect to the Class Action Waiver below, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this Arbitration Agreement, including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable. This Arbitration Agreement is governed by the Federal Arbitration Act ("FAA") and evidences a transaction involving commerce. The arbitration will be conducted before a single arbitrator under the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), which are available at the AAA website (www.adr.org). A court of competent jurisdiction shall have the authority to enter judgment upon the arbitrator's decision/award. The parties agree to bring any claim or dispute in arbitration on an individual basis only, and not as a class or representative action, and there will be no right or authority for any claim or dispute to be brought, heard or arbitrated as a class or representative action ("Class Action Waiver"). Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules, any dispute relating to the interpretation, applicability, enforceability or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator. This Arbitration Agreement does not apply to any claim or dispute that an applicable federal statute states cannot be arbitrated.

DECLARATION OF NANDAN M. JOSHI

EXHIBIT 3

CONSUMER

# Consumer Arbitration Rules





Available online at **adr.org/consumer**

Rules Amended and Effective September 1, 2014
Costs of Arbitration Amended and Effective September 1, 2018

# Table of Contents

Consumer Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

About the AAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

The Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

The AAA's Consumer Arbitration Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Availability of Mediation through AAA Mediation.org . . . . . . . . . . . . . . . . . . . . . . . .7

Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Arbitrator's Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Filing a Case and Initial AAA Administrative Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

R-1. Applicability (When the AAA Applies These Rules) . . . . . . . . . . . . . . . . . . . . . . .9

R-2. Starting Arbitration under an Arbitration Agreement in a Contract . . . . . . . . . . . .11

R-3. Agreement to Arbitrate When There is No AAA Arbitration Clause . . . . . . . . . . .13

R-4. AAA Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

R-5. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

R-6. Depositing Neutral Arbitrator's Compensation with the AAA. . . . . . . . . . . . . . . .14

R-7. Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

R-8. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

R-9. Small Claims Option for the Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

R-10. Administrative Conference with the AAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

R-11. Fixing of Locale (the city, county, state, territory and/or country where the
arbitration will take place). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

R-12. Business Notification and Publicly-Accessible Consumer Clause Registry . . . . . .16

R-13. AAA and Delegation of Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

R-14. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Appointing the Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

R-15. National Roster of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

R-16. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

R-17. Number of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

R-18. Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

R-19. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

R-20. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

Pre-Hearing Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-21. Preliminary Management Hearing with the Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . 20

R-22. Exchange of Information between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-23. Enforcement Powers of the Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

R-24. Written Motions (except for Dispositive Motions—see R-33) . . . . . . . . . . . . . . . 21

R-25. Representation of a Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

R-26. Setting the Date, Time, and Place (the physical site of the hearing within the designated locale) of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R-27. Written Record of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R-28. Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

R-29. Documents-Only Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-30. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-31. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-32. Conduct of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

R-33. Dispositive Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-34. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-35. Evidence by Affidavit and Post-Hearing Filing of Documents or Other Evidence 25

R-36. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

R-37. Interim Measures (a preliminary decision made by the arbitrator involving part or all of the issue(s) in dispute in the arbitration) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R-38. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

R-39. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . . 26


Conclusion of the Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-40. Closing of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-41. Reopening of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-42. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-43. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

R-44. Scope of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

R-45. Award upon Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

R-46. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

R-47. Modification of Award for Clerical, Typographical, or Mathematical Errors . . . . . . 29

Post Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    R-48. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . 30

    R-49. Applications to Court and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . 30

General Procedural Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    R-50. Waiver of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    R-51. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    R-52. Serving of Notice and AAA and Arbitrator Communications . . . . . . . . . . . . . . . . 31

    R-53. Interpretation and Application of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    R-54. Remedies for Nonpayment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    R-55. Declining or Ceasing Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Costs of Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    (i) Filing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    (ii) Case Management Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    (iii) Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    (iv) Hearing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    (v) Hearing Room Rental. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    (vi) Abeyance Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    (vii) Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    (viii) Consumer Clause Review and Registry Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    (ix) Reallocation of Arbitrator Compensation, AAA Administrative Fees and Certain Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Procedures for the Resolution of Disputes through Document Submission . . . . . 38

    D-1. Applicability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    D-2. Preliminary Management Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    D-3. Removal from the Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    D-4. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Glossary of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Administrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    ADR Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    ADR Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    ADR Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    Arbitration Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Case Administrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Claimant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Demand for Arbitration (also referred to as "Demand"). . . . . . . . . . . . . . . . . . 41

    Documents-Only Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    Independent ADR Institution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    In-Person Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    Neutral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Opposing Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Respondent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Telephone Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# Consumer Arbitration Rules



## Introduction

Millions of consumer purchases take place each year. Occasionally, these transactions lead to disagreements between consumers and businesses. These disputes can be resolved by arbitration. Arbitration is usually faster and cheaper than going to court.

The American Arbitration Association® ("AAA®," "the Association") applies the *Consumer Arbitration Rules* ("Rules") to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA has the discretion to apply or not to apply the *Consumer Arbitration Rule*, and the parties are able to bring any disputes concerning the application or non-application of the Rules to the attention of the arbitrator. Consumers and businesses are permitted to seek relief in a small claims court for disputes or claims within the scope of the small claims court's jurisdiction. These Rules were drafted and designed to be consistent with the minimum due process principles of the *Consumer Due Process Protocol*.

## About the AAA

The administrator's role is to manage the administrative aspects of the arbitration, such as the appointment of the arbitrator, preliminary decisions about where hearings might take place, and handling the fees associated with the arbitration. As administrator, however, the AAA does not decide the merits of a case or make any rulings on issues such as what documents must be shared with each side. Because the AAA's role is only administrative, the AAA cannot overrule or change an arbitrator's decisions or rulings. The administrator will comply with any court orders issued from litigation involving the parties to the dispute.

The American Arbitration Association, founded in 1926, is a neutral, independent, and private not-for-profit organization. We offer a broad range of conflict management services to businesses, organizations, and individuals. We also provide education, training, and publications focused on methods for settling disputes out of court.

## The Arbitrator

Except where the parties to a case reach their own settlement, the arbitrator will make the final, binding decision called the Award on the dispute and render it in writing. The Arbitrator makes all the procedural decisions on a case not made by the Administrator or not decided jointly by the parties. The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law or laws that apply to the case.

Arbitrators are neutral and independent decision makers who are not employees of the AAA. Once appointed to a case, an arbitrator may not be removed by one party without the other party's consent or unless the Administrator determines an arbitrator should be removed and replaced by another arbitrator chosen by the Administrator in a manner described in these Rules.

## The AAA's Consumer Arbitration Rules

The AAA has developed the *Consumer Arbitration Rules* for consumers and businesses that want to have their disagreements resolved through arbitration.

## Availability of Mediation through AAA Mediation.org

Mediation in consumer disputes is also available to help parties resolve their disputes. Parties interested in participating in mediation may find a mediator through **www.aaamediation.org.**

## Administrative Fees

The Association charges a fee for its services under these Rules. A fee schedule is included at the end of these Rules in the Costs of Arbitration section.

## Arbitrator's Fees

Arbitrators are paid for the time they spend resolving disputes. The business makes deposits as outlined in the fee schedule in the Costs of Arbitration section of these Rules. Unused deposits are refunded at the end of the case.

## Notification

A business intending to incorporate these Rules or to refer to the dispute resolution services of the AAA in a consumer alternative dispute resolution ("ADR") plan should, at least 30 days prior to the planned effective date of the program,

- notify the Association of its intention to do so, and
- provide the Association with a copy of the consumer dispute resolution plan.

If a business does not comply with this requirement, the Association reserves the right to withhold its administrative services. For more information, please see R-12 below.

## Filing a Case and Initial AAA Administrative Steps

### R-1. Applicability (When the AAA Applies These Rules)

**(a)** The parties shall have made these *Consumer Arbitration Rules* ("Rules") a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA"), and

  **1)** have specified that these *Consumer Arbitration Rules* shall apply;

  **2)** have specified that the *Supplementary Procedures for Consumer-Related Disputes* shall apply, which have been amended and renamed the *Consumer Arbitration Rules*;

  **3)** the arbitration agreement is contained within a consumer agreement, as defined below, that does not specify a particular set of rules; or

  **4)** the arbitration agreement is contained within a consumer agreement, as defined below, that specifies a particular set of rules other than the *Consumer Arbitration Rules.*

When parties have provided for the AAA's rules or AAA administration as part of their consumer agreement, they shall be deemed to have agreed that the application of the AAA's rules and AAA administration of the consumer arbitration shall be an essential term of their consumer agreement.

The AAA defines a consumer agreement as an agreement between an individual consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use.

Examples of contracts that typically meet the criteria for application of these Rules, if the contract is for personal or household goods or services and has an arbitration provision, include, but are not limited to the following:

- Credit card agreements
- Telecommunications (cell phone, ISP, cable TV) agreements
- Leases (residential, automobile)
- Automobile and manufactured home purchase contracts
- Finance agreements (car loans, mortgages, bank accounts)
- Home inspection contracts
- Pest control services

- Moving and storage contracts
- Warranties (home, automobile, product)
- Legal funding
- Health and fitness club membership agreements
- Travel services
- Insurance policies
- Private school enrollment agreements

Examples of contracts that typically do not meet the criteria for application of these Rules, should the contract contain an arbitration provision, include, but are not limited to the following:

- Home construction and remodeling contracts
- Real estate purchase and sale agreements
- Condominium or homeowner association by-laws
- Business insurance policies (including crop insurance)
- Commercial loan and lease agreements
- Commercial guaranty agreements

**(b)** When parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these Rules and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

**(c)** The consumer and the business may agree to change these Rules. If they agree to change the Rules, they must agree in writing. If the consumer and the business want to change these Rules after the appointment of the arbitrator, any changes may be made only with the approval of the arbitrator.

**(d)** The AAA administers consumer disputes that meet the due process standards contained in the *Consumer Due Process Protocol* and the *Consumer Arbitration Rules.* The AAA will accept cases after the AAA reviews the parties' arbitration agreement and if the AAA determines the agreement substantially and materially complies with the due process standards of these Rules and the *Consumer Due Process Protocol.* Should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

**(e)** The AAA has the initial authority to apply or not to apply the *Consumer Arbitration Rules*. If either the consumer or the business disagrees with the AAA's decision, the objecting party must submit the objection by the due date for filing an answer to the demand for arbitration. If an objection is filed, the arbitrator shall have the authority to make the final decision on which AAA rules will apply.

**(f)** If, within 30 days after the AAA's commencement of administration, a party seeks judicial intervention with respect to a pending arbitration and provides the AAA with documentation that judicial intervention has been sought, the AAA will suspend administration for 30 days to permit the party to obtain a stay of arbitration from the court.

**(g)** Where no disclosed claims or counterclaims exceed $25,000, the dispute shall be resolved by the submission of documents only/desk arbitration (see R-29 and the *Procedures for the Resolution of Disputes through Document Submission* below). Any party, however, may ask for a hearing. The arbitrator also may decide that a hearing is necessary.

## R-2. Starting Arbitration under an Arbitration Agreement in a Contract

**(a)** Arbitration filed under an arbitration agreement naming the AAA shall be started in the following manner:

**(1)** The party who starts the arbitration (referred to as the "claimant" throughout the arbitration) must contact, in writing, the party that the case is filed against (referred to as the "respondent" throughout the arbitration) that it wishes to arbitrate a dispute. This written contact is referred to as the Demand for Arbitration ("Demand"). The Demand must do the following:

- Briefly explain the dispute

- List the names and addresses of the consumer and the business, and, if known, the names of any representatives of the consumer and the business

- Specify the amount of money in dispute, if applicable

- Identify the requested location for the hearing if an in-person hearing is requested

- State what the claimant wants

**(2)** The claimant must also send one copy of the Demand to the AAA at the same time the demand is sent to the respondent. When sending a Demand to the AAA, the claimant must also send the following:

- A copy of the arbitration agreement contained in the contract and/or agreement and/or purchase document

- The proper filing fee; the amount of the filing fee can be found in the Costs of Arbitration section at the end of these Rules.

**(3)** If the arbitration is pursuant to a court order, the claimant must send one copy of the Demand to the AAA at the same time the Demand is sent to the respondent. When sending a demand to the AAA, the claimant must also send the following:

- A copy of the court order

- A copy of the arbitration agreement contained in the contract and/or agreement and/or purchase document

- The proper filing fee

The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party either to make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

The claimant may file by mail. The mailing address of the AAA's Case Filing Services is:

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

 Or, the claimant may file online using AAA WebFile: **https://www.adr.org**

Or, the claimant may file at any of the AAA's offices.

**(b)** The AAA will send a written notice letting the consumer and the business know the Demand for Arbitration has been received.

**(c)** The respondent may submit a written response to the Demand, known as an "answer," which describes how the respondent responds to the claimant's claim. The answer must be sent to the AAA within 14 calendar days after the date the AAA notifies the parties that the Demand for Arbitration was received and all filing requirements were met. The answer must be

- in writing,

- sent to the AAA, and

- sent to the claimant at the same time.

**(d)** The respondent may also file a counterclaim, which is the respondent filing a Demand against the claimant. If the respondent has a counterclaim, the counterclaim must briefly explain the dispute, specify the amount of money involved, and state what the respondent wants.

**(e)** If no answer is filed within 14 calendar days, the AAA will assume that the respondent does not agree with the claim filed by the claimant. The case will move forward after 14 days regardless of whether an answer is filed.

**(f)** When sending a Demand or an answer, the consumer and the business are encouraged to provide enough details to make the dispute clear to the arbitrator.

## R-3. Agreement to Arbitrate When There is No AAA Arbitration Clause

If the consumer and business do not have an arbitration agreement or their arbitration agreement does not name the AAA, the parties may agree to have the AAA arbitrate their dispute. To start the arbitration, the parties must send the AAA a submission agreement, which is an agreement to arbitrate their case with the AAA, signed by the consumer and the business (email communications between all parties to a dispute reflecting an agreement to arbitrate also is acceptable). The submission agreement must

- be in writing (electronic communication is acceptable);
- be signed by both parties;
- briefly explain the dispute;
- list the names and addresses of the consumer and the business;
- specify the amount of money involved;
- specify the requested location for the hearing if an in-person hearing is requested; and
- state the solution sought.

The parties should send one copy of the submission agreement to the AAA. They must also send the proper filing fees. A fee schedule can be found in the Costs of Arbitration section at the end of these Rules.

## R-4. AAA Administrative Fees

As a not-for-profit organization, the AAA charges fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the case is filed shall apply for all fees charged during the administration of the case. The AAA may, in the event of the consumer's extreme hardship, defer or reduce the consumer's administrative fees.

AAA fees shall be paid in accordance with the Costs of Arbitration section found at the end of these Rules.

### R-5. Neutral Arbitrator's Compensation

**(a)** Arbitrators serving under these Rules shall be compensated at a rate established by the AAA.

**(b)** Any arrangement for the compensation of an arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

**(c)** Arbitrator compensation shall be paid in accordance with the Costs of Arbitration section found at the end of these Rules.

### R-6. Depositing Neutral Arbitrator's Compensation with the AAA

The AAA may require the parties to deposit in advance of any hearings such sums of money as it decides are necessary to cover the expense of the arbitration, including the arbitrator's fee, and shall render an accounting to the parties and return any unused money at the conclusion of the case.

### R-7. Expenses

Unless otherwise agreed by the parties or as provided under applicable law, the expenses of witnesses for either side shall be borne by the party producing such witnesses.

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne in accordance with the Costs of Arbitration section found at the end of these Rules.

### R-8. Changes of Claim

Once a Demand has been filed, any new claims or counterclaims, or changes to the claim or counterclaim, must be made in writing and sent to the AAA. The party making the new or different claim or counterclaim shall send a copy to the opposing party. As with the original Demand or counterclaim, a party shall have 14 calendar days from the date the AAA notifies the parties it received the new or different claim or counterclaim to file an answering statement with the AAA.

If an arbitrator has already been appointed, a new or different claim or counterclaim may only be considered if the arbitrator allows it.

### R-9. Small Claims Option for the Parties

If a party's claim is within the jurisdiction of a small claims court, either party may choose to take the claim to that court instead of arbitration as follows:

**(a)** The parties may take their claims to small claims court without first filing with the AAA.

**(b)** After a case is filed with the AAA, but before the arbitrator is formally appointed to the case by the AAA, a party can send a written notice to the opposing party and the AAA that it wants the case decided by a small claims court. After receiving this notice, the AAA will administratively close the case.

**(c)** After the arbitrator is appointed, if a party wants to take the case to small claims court and notifies the opposing party and the AAA, it is up to the arbitrator to determine if the case should be decided in arbitration or if the arbitration case should be closed and the dispute decided in small claims court.

### R-10. Administrative Conference with the AAA

At the request of any party or if the AAA should so decide, the AAA may have a telephone conference with the parties and/or their representatives. The conference may address issues such as arbitrator selection, the possibility of a mediated settlement, exchange of information before the hearing, timing of the hearing, the type of hearing that will be held, and other administrative matters.

### R-11. Fixing of Locale (the city, county, state, territory and/or country where the arbitration will take place)

If an in-person hearing is to be held and if the parties do not agree to the locale where the hearing is to be held, the AAA initially will determine the locale of the arbitration. If a party does not agree with the AAA's decision, that party can ask the arbitrator, once appointed, to make a final determination. The locale determination will be made after considering the positions of the parties, the circumstances of the parties and the dispute, and the *Consumer Due Process Protocol*.

### R-12. Business Notification and Publicly-Accessible Consumer Clause Registry

Beginning September 1, 2014, a business that provides for or intends to provide for these Rules or another set of AAA Rules in a consumer contract (as defined in R-1) should

1. notify the AAA of the existence of such a consumer contract or of its intention to do so at least 30 days before the planned effective date of the contract.

2. provide the AAA a copy of the arbitration agreement.

Upon receiving the arbitration agreement, the AAA will review the agreement for material compliance with due process standards contained in the *Consumer Due Process Protocol* and the *Consumer Arbitration Rules* (see Rule 1(d)). There is a nonrefundable fee to conduct this initial review and maintain a publicly-available clause registry, which is detailed in the Costs of Arbitration section found at the end of these Rules. Any subsequent changes, additions, deletions, or amendments to a currently-registered arbitration agreement must be resubmitted for review and a review fee will be assessed at that time. The AAA will decline to administer consumer arbitrations arising out of that arbitration agreement where the business fails to pay the review fee.

If a business does not submit its arbitration agreement for review and a consumer arbitration then is filed with the AAA, the AAA will conduct an expedited review at that time. Along with any other filing fees that are owed for that case, the business also will be responsible for paying the nonrefundable review and Registry fee (including any fee for expedited review at the time of filing) for this initial review, which is detailed in the Costs of Arbitration section found at the end of these Rules. The AAA will decline to administer consumer arbitrations arising out of that arbitration agreement if the business declines to pay the review and Registry fee.

After the AAA reviews the submitted consumer clause, receives the annual consumer registry fee, and determines it will administer consumer-related disputes filed pursuant to the consumer clause, the business will be included on the publicly-accessible Consumer Clause Registry. This Consumer Clause Registry maintained by the AAA will contain the name of the business, the address, and the consumer arbitration clause, along with any related documents as deemed necessary by the AAA. The AAA's review of a consumer arbitration clause and determination whether or not to administer arbitrations pursuant to

that clause is only an administrative determination by the AAA and cannot be relied upon or construed as a legal opinion or advice regarding the enforceability of the arbitration clause. Consumer arbitration agreements may be registered at: **www.adr.org/consumerclauseregistry** or via email at **consumerreview@adr.org.**

For more information concerning the Consumer Clause Registry, please visit the AAA's website at **www.adr.org/consumerclauseregistry.**

The Registry fee to initially review a business's agreement and maintain the clause registry list is a yearly, non-refundable fee for the business's arbitration agreement. Any different arbitration agreements submitted by the same business or its subsidiaries must be submitted for review and are subject to the current review fee.

If the AAA declines to administer a case due to the business's non-compliance with this notification requirement, the parties may choose to submit their dispute to the appropriate court.

## R-13. AAA and Delegation of Duties

When the consumer and the business agree to arbitrate under these Rules or other AAA rules, or when they provide for arbitration by the AAA and an arbitration is filed under these Rules, the parties also agree that the AAA will administer the arbitration. The AAA's administrative duties are set forth in the parties' arbitration agreement and in these Rules. The AAA will have the final decision on which office and which AAA staff members will administer the case. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

## R-14. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## Appointing the Arbitrator

### R-15. National Roster of Arbitrators

The AAA maintains a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators from this National Roster to resolve the parties' dispute(s).

### R-16. Appointment from National Roster

(a) If the parties have not appointed an arbitrator and have not agreed to a process for appointing the arbitrator, immediately after the filing of the submission agreement or the answer, or after the deadline for filing the answer, the AAA will administratively appoint an arbitrator from the National Roster.

(b) If the parties' arbitration agreement provides for three or more arbitrators and they have not appointed the arbitrators and have not agreed to a process for appointing the arbitrators, immediately after the filing of the submission agreement or the answer, or after the deadline for filing the answer, the AAA will administratively appoint the arbitrators from the National Roster. The AAA will appoint the chairperson.

(c) Arbitrator(s) serving under these Rules will be neutral and must meet the standards of R-19 with respect to being impartial and independent.

### R-17. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators and the parties do not agree on the number, the dispute shall be heard and decided by one arbitrator.

### R-18. Disclosure

(a) Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, must provide information to the AAA of any circumstances likely to raise justifiable doubt as to whether the arbitrator can remain impartial or independent. This disclosure of information would include

(1) any bias;

(2) any financial interest in the result of the arbitration;

(3) any personal interest in the result of the arbitration; or

(4) any past or present relationship with the parties or their representatives.

Such obligation to provide disclosure information remains in effect throughout the arbitration. A failure on the part of a party or a representative to comply with the

requirements of this rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-50.

**(b)** If the AAA receives such information from the arbitrator or another source, the AAA will communicate the information to the parties. If the AAA decides it is appropriate, it will also communicate the information to the arbitrator and others.

**(c)** In order to encourage disclosure by arbitrators, disclosing such information does not mean that the arbitrator considers the disclosed information will likely affect his or her ability to be impartial or independent.

## R-19. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties carefully and in good faith. The AAA may disqualify an arbitrator who shows

**(1)** partiality or lack of independence;

**(2)** inability or refusal to perform his or her duties with diligence and in good faith; or

**(3)** any grounds for disqualification provided by applicable law.

**(b)** If a party objects to the continued service of an arbitrator, or if the AAA should so decide to raise the issue of whether the arbitrator should continue on the case, the AAA will decide if the arbitrator should be disqualified.  After gathering the opinions of the parties, the AAA will decide and that decision shall be final and conclusive.

## R-20. Vacancies

If for any reason an arbitrator cannot or is unwilling to perform the duties of the office, the AAA may declare the office vacant. Any vacancies shall be filled based on the original procedures used to appoint the arbitrator. If a substitute arbitrator is appointed, the substitute arbitrator will decide if it is necessary to repeat all or part of any prior ruling or hearing.

## Pre-Hearing Preparation

### R-21. Preliminary Management Hearing with the Arbitrator

**(a)** If any party asks for, or if the AAA or the arbitrator decides to hold one, the arbitrator will schedule a preliminary management hearing with the parties and/or their representatives as soon as possible. The preliminary management hearing will be conducted by telephone unless the arbitrator decides an in-person preliminary management hearing is necessary.

**(b)** During the preliminary management hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of issues and claims, scheduling of the hearings, and any other preliminary matters.

**(c)** The arbitrator shall promptly issue written orders that state the arbitrator's decisions made during or as a result of the preliminary management hearing. The arbitrator may also conduct additional preliminary management hearings if the need arises.

### R-22. Exchange of Information between the Parties

**(a)** If any party asks or if the arbitrator decides on his or her own, keeping in mind that arbitration must remain a fast and economical process, the arbitrator may direct

  **1)** specific documents and other information to be shared between the consumer and business, and

  **2)** that the consumer and business identify the witnesses, if any, they plan to have testify at the hearing.

**(b)** Any exhibits the parties plan to submit at the hearing need to be shared between the parties at least five business days before the hearing, unless the arbitrator sets a different exchange date.

**(c)** No other exchange of information beyond what is provided for in section (a) above is contemplated under these Rules, unless an arbitrator determines further information exchange is needed to provide for a fundamentally fair process.

**(d)** The arbitrator has authority to resolve any disputes between the parties about exchanging information.

### R-23. Enforcement Powers of the Arbitrator

The arbitrator may issue any orders necessary to enforce the provisions of rules R-21 and R-22 and to otherwise achieve a fair, efficient, and economical resolution of the case, including, but not limited to:

**(a)** an order setting the conditions for any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing in order to preserve such confidentiality;

**(b)** to the extent the exchange of information takes place pursuant to R-22, imposing reasonable search limitations for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically-stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders that the arbitrator is empowered to issue under applicable law.

## R-24. Written Motions (except for Dispositive Motions—see R-33)

The arbitrator may consider a party's request to file a written motion (except for Dispositive Motions— see R-33) only after the parties and the arbitrator conduct a conference call to attempt to resolve the issue that gives rise to the proposed motion. Only after the parties and the arbitrator hold the call may the arbitrator consider a party's request to file a written motion. The arbitrator has the sole discretion to allow or deny the filing of a written motion and his or her decision is final.

## R-25. Representation of a Party

Any party may participate in the arbitration without representation, or may be represented by counsel or other authorized representative, unless such choice is prohibited by applicable law. A party intending to be represented shall give the opposing party and the AAA the name, address, and contact information of the representative at least three business days before the hearing where that representative will first appear in the case. It will be considered proper notice if a representative files the arbitration demand or answer or responds for a party during the course of the arbitration.

While parties do not need an attorney to participate in arbitration, arbitration is a final, legally-binding process that may impact a party's rights. As such, parties may want to consider consulting an attorney.

### R-26. Setting the Date, Time, and Place (the physical site of the hearing within the designated locale) of Hearing

The arbitrator will set the date, time, and place for each hearing within the locale as determined in R-11. A hearing may be by telephone or in person. For their part, the parties commit to

**(1)** respond promptly to the arbitrator when he or she asks what dates the parties are available to have the hearings;

**(2)** cooperate in the scheduling of the hearing on the earliest possible date; and

**(3)** follow the hearing schedule set up by the arbitrator.

The AAA will send a notice of the hearing to the parties at least 10 days before the hearing date, unless the parties agree to a different time frame.

### R-27. Written Record of Hearing

**(a)** If a party wants a written record of the hearing, that party must make such arrangement directly with a stenographer (court reporter) and notify the opposing parties, the AAA, and the arbitrator of these arrangements at least three business days before the hearing. The party or parties who request the written record shall pay the cost of the service.

**(b)** No other type of recording will be allowed unless the parties agree or the arbitrator directs a different form of recording.

**(c)** The arbitrator may resolve disputes between the parties over who will pay the costs of the written record or other type of recording.

**(d)** The parties can agree or the arbitrator may decide that the transcript (written record) is the official record of the hearing. If it is the official record of the hearing, the transcript must be given to the arbitrator and made available to all the parties so that it can be reviewed. The date, time, and place of the inspection will be decided by the arbitrator.

### R-28. Interpreters

If a party wants an interpreter present for any part of the process, that party must make arrangements directly with the interpreter and shall pay for the costs of the service.

### R-29. Documents-Only Procedure

Disputes may be resolved by submission of documents and without in-person or telephonic hearings. For cases being decided by the submission of documents only, the *Procedures for the Resolution of Disputes through Document Submission* (found at the end of these Rules) shall supplement these Rules. These Procedures will apply where no disclosed claims or counterclaims exceed $25,000 (see R-1(g)), unless any party requests an in-person or telephonic hearing or the arbitrator decides that a hearing is necessary.

## Hearing Procedures

### R-30. Attendance at Hearings

The arbitrator and the AAA will keep information about the arbitration private except to the extent that a law provides that such information shall be shared or made public. The parties and their representatives in the arbitration are entitled to attend the hearings. The arbitrator will determine any disputes over whether a non-party may attend the hearing.

### R-31. Oaths

Before starting the hearing, each arbitrator may take an oath of office and, if required by law, shall do so. If the arbitrator determines that witnesses shall testify under oath, then the arbitrator will direct the oath be given by a duly-qualified person.

### R-32. Conduct of Proceedings

(a) The claimant must present evidence to support its claim. The respondent must then present evidence to support its defense. Witnesses for each party also must answer questions from the arbitrator and the opposing party. The arbitrator may change this procedure, as long as each party has the right to be heard and is given a fair opportunity to present its case.

(b) When the arbitrator decides it is appropriate, the arbitrator may also allow the parties to present evidence in alternative ways, including web conferencing, Internet communication, and telephonic conferences. All procedures must provide the parties with a full and equal opportunity to present any evidence that the arbitrator decides is material and relevant to deciding the dispute. If the alternative ways to present evidence involve witnesses, those ways may include that the witness submit to direct and cross-examination questioning.

(c) The arbitrator will use his or her discretion to resolve the dispute as quickly as possible and may direct the parties to present the evidence in a certain order, or may split the proceedings into multiple parts and direct the parties in the presentation of evidence.

(d) The hearing generally will not exceed one day. However, if a party shows good cause, the arbitrator may schedule additional hearings within seven calendar days after the initial day of hearing.

(e) The parties may agree in writing to waive oral hearings.

## R-33. Dispositive Motions

The arbitrator may allow the filing of a dispositive motion if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case.

## R-34. Evidence

**(a)** The parties may offer relevant and material evidence and must produce any evidence the arbitrator decides is necessary to understand and decide the dispute. Following the legal rules of evidence shall not be necessary. All evidence should be taken in the presence of the arbitrator and all of the parties, unless any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine what evidence will be admitted, what evidence is relevant, and what evidence is material to the case. The arbitrator may also exclude evidence that the arbitrator decides is cumulative or not relevant.

**(c)** The arbitrator shall consider applicable principles of legal privilege, such as those that involve the confidentiality of communications between a lawyer and a client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so on the request of any party or on the arbitrator's own determination. If a party requests the arbitrator sign a subpoena, that party shall copy the request to the other parties in the arbitration at the same time it is provided to the arbitrator.

## R-35. Evidence by Affidavit and Post-Hearing Filing of Documents or Other Evidence

**(a)** The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit rather than in-person testimony but will give this evidence only such credence as the arbitrator decides is appropriate. The arbitrator will consider any objection to such evidence made by the opposing party.

**(b)** If the parties agree or the arbitrator decides that documents or other evidence need to be submitted to the arbitrator after the hearing, those documents or other evidence will be filed with the AAA so that they can be sent to the arbitrator. All parties will be given the opportunity to review and respond to these documents or other evidence.

## R-36. Inspection or Investigation

An arbitrator finding it necessary to inspect property or conduct an investigation in connection with the arbitration will request that the AAA inform the parties. The arbitrator will set the date and time of the inspection and investigation, and

the AAA will notify the parties. Any party who would like to be present at the inspection or investigation may attend. If one or all parties are not present at the inspection or investigation, the arbitrator will make an oral or written report to the parties and allow them an opportunity to comment.

### R-37. Interim Measures (a preliminary decision made by the arbitrator involving part or all of the issue(s) in dispute in the arbitration)

**(a)** The arbitrator may grant whatever interim measures he or she decides are necessary, including granting an injunction and ordering that property be protected.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require a security payment for the costs of such measures.

**(c)** When making a decision on an interim measure, the arbitrator may grant any remedy, relief, or outcome that the parties could have received in court.

**(d)** A party to an arbitration agreement under these Rules may instead file in state or federal court for interim relief. Applying to the court for this type of relief, including temporary restraining orders, is consistent with the agreement to arbitrate and will not be considered a waiver of the right to arbitrate.

### R-38. Postponements

The arbitrator may postpone any hearing

**(a)** if requested by a party, and the party shows good cause for the postponement;

**(b)** if all parties agree to a postponement;

**(c)** on his or her own decision.

### R-39. Arbitration in the Absence of a Party or Representative

The arbitration may proceed even if any party or representative is absent, so long as proper notice was given and that party or representative fails to appear or obtain a postponement from the arbitrator. An award cannot be made only because of the default of a party. The arbitrator shall require the party who participates in the hearing to submit the evidence needed by the arbitrator to make an award.

## Conclusion of the Hearing

### R-40. Closing of Hearing

The arbitrator must specifically ask all parties whether they have any further proofs to offer or witnesses to be heard. When the arbitrator receives negative replies or he or she is satisfied that the record is complete, the arbitrator will declare the hearing closed.

If briefs or other written documentation are to be filed by the parties, the hearing shall be declared closed as of the final date set by the arbitrator. Absent agreement of the parties, the time that the arbitrator has to make the award begins upon the closing of the hearing. The AAA may extend the time limit for the rendering of the award only in unusual and extreme circumstances.

### R-41. Reopening of Hearing

If a party requests, or if the arbitrator decides to do so, the hearing may be reopened at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. If the arbitrator reopens the hearing, he or she shall have 30 days from the closing of the reopened hearing within which to make an award.

### R-42. Time of Award

The award shall be issued promptly by the arbitrator and, unless the parties agree differently or the law indicates a different time frame, no later than 30 calendar days from the date the hearing is closed, or, if the case is a documents-only procedure, 14 calendar days from the date the arbitrator set for his or her receipt of the final statements and proofs. The AAA may extend the time limit for the rendering of the award only in unusual and extreme circumstances.

### R-43. Form of Award

(a) Any award shall be in writing and executed in the form and manner required by law.

(b) The award shall provide the concise written reasons for the decision unless the parties all agree otherwise. Any disagreements over the form of the award shall be decided by the arbitrator.

**(c)** The AAA may choose to publish an award rendered under these Rules; however, the names of the parties and witnesses will be removed from awards that are published, unless a party agrees in writing to have its name included in the award.

## R-44. Scope of Award

**(a)** The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and divide up the fees, expenses, and compensation related to such award as the arbitrator decides is appropriate, subject to the provisions and limitations contained in the Costs of Arbitration section.

**(c)** The arbitrator may also allocate compensation, expenses as defined in sections (v) and (vii) of the Costs of Arbitration section, and administrative fees (which include Filing and Hearing Fees) to any party upon the arbitrator's determination that the party's claim or counterclaim was filed for purposes of harassment or is patently frivolous.

**(d)** In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-4, R-5, and R-7 in favor of any party, subject to the provisions and limitations contained in the Costs of Arbitration section.

## R-45. Award upon Settlement

If the parties settle their dispute at any point during the arbitration and at the parties' request, the arbitrator may lay out the terms of the settlement in a "consent award" (an award drafted and signed by the arbitrator that reflects the settlement terms of the parties). A consent award must include a division of the arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses. Consent awards will not be made available to the public per Rule 43(c) unless the parties agree otherwise.

## R-46. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-47. Modification of Award for Clerical, Typographical, or Mathematical Errors

**(a)** Within 20 days after the award is transmitted, any party, upon notice to the opposing parties, may contact the AAA and request that the arbitrator correct any clerical, typographical, or mathematical errors in the award. The arbitrator has no power to re-determine the merits of any claim already decided.

**(b)** The opposing parties shall be given 10 days to respond to the request. The arbitrator shall make a decision on the request within 20 days after the AAA transmits the request and any responses to the arbitrator.

**(c)** If applicable law provides a different procedural time frame, that procedure shall be followed.

## Post Hearing

### R-48. Release of Documents for Judicial Proceedings

The AAA shall give a party certified copies of any records in the AAA's possession that may be required in judicial proceedings relating to the arbitration, except for records determined by the AAA to be privileged or confidential. The party will have to pay a fee for this service.

### R-49. Applications to Court and Exclusion of Liability

**(a)** No court or judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these Rules is a necessary or proper party in judicial proceedings relating to the arbitration.

**(c)** Parties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these Rules shall be deemed to have consented that neither the AAA, AAA employees, nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

**(e)** Parties to an arbitration under these Rules may not call the arbitrator, the AAA, or any AAA employee as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA, and AAA employees are not competent to and may not testify as witnesses in any such proceeding.

## General Procedural Rules

### R-50. Waiver of Rules

If a party knows that any of these Rules have not been followed, it must object in writing before proceeding with arbitration or it will lose its right to object that the rule has not been followed.

### R-51. Extensions of Time

The parties may agree to change any period of time provided for in the Rules, except that any such modification that negatively affects the efficient resolution of the dispute is subject to review and approval by the arbitrator. The AAA or the arbitrator may for good cause extend any period of time in these Rules, except as set forth in R-42. The AAA will notify the parties of any extension.

### R-52. Serving of Notice and AAA and Arbitrator Communications

**(a)** Any papers or notices necessary for the initiation or continuation of an arbitration under these Rules, or for the entry of judgment on any award made under these Rules, may be served on a party by mail or email addressed to the party or its representative at the last-known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

**(b)** The AAA, the arbitrator, and the parties also may use overnight delivery, electronic facsimile transmission (fax), or electronic mail (email) to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be sent by other methods of communication.

**(c)** Unless directed differently by the AAA or by the arbitrator, any documents and all written communications submitted by any party to the AAA or to the arbitrator also shall be sent at the same time to all parties to the arbitration.

**(d)** A failure to provide the other parties with copies of communications made to the AAA or to the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained within those communications.

**(e)** A party and/or someone acting on behalf of a party cannot have any communications with an arbitrator or a potential arbitrator about the arbitration outside of the presence of the opposing party. All such communications shall be conducted through the AAA.

**(f)** The AAA may direct that any oral or written communications that are sent by a party or their representative shall be sent in a particular manner. The failure of a party or its representative to do so may result in the AAA's refusal to consider the issue raised in the communication.

Rules Amended and Effective September 1, 2014. Costs of Arbitration Amended and Effective September 1, 2018.

CONSUMER   31

### R-53. Interpretation and Application of Rules

The arbitrator shall interpret and apply these Rules as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other Rules shall be interpreted and applied by the AAA.

### R-54. Remedies for Nonpayment

**(a)** If arbitrator compensation or administrative charges have not been paid in full, the AAA may inform the parties so that one of them may forward the required payment.

**(b)** Once the AAA informs the parties that payments have not been received, a party may request an order from the arbitrator directing what measures might be taken in light of a party's nonpayment.

Such measures may include limiting a party's ability to assert or pursue its claim. However, a party shall never be precluded from defending a claim or counterclaim. The arbitrator must provide the party opposing a request for relief with the opportunity to respond prior to making any determination. In the event that the arbitrator grants any request for relief that limits any party's participation in the arbitration, the arbitrator will require the party who is making a claim and who has made appropriate payments to submit the evidence required to make an award.

**(c)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(d)** If arbitrator compensation or AAA administrative fees remain unpaid after a determination to suspend an arbitration due to nonpayment, the arbitrator has the authority to terminate the proceedings. Such an order shall be in writing and signed by the arbitrator. The impact of the termination for nonpayment of the Consumer Clause Registry fee is the removal from the "Registered" section of the Registry.

### R-55. Declining or Ceasing Arbitration

The AAA in its sole discretion may decline to accept a Demand for Arbitration or stop the administration of an ongoing arbitration due to a party's improper conduct, including threatening or harassing behavior towards any AAA staff, an arbitrator, or a party or party's representative.

## Costs of Arbitration

Arbitrator compensation, expenses as defined in sections (v) and (vii) below, and Administrative Fees (which includes Filing Fees, Case Management Fees and Hearing Fees) are not subject to reallocation by the arbitrator(s) except as may be required by applicable law or upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

| Party | Desk/Documents-Only Arbitration | In-Person or Telephonic Hearing Arbitration |
|---|---|---|
| Consumer | **Filing Fee:** $200 (nonrefundable) $0 if Case Filed by Business | **Filing Fee:** $200 (nonrefundable) $0 if Case Filed by Business |
| Business | **Filing Fee (nonrefundable):** $300 for 1 or $425 for 3 arbitrators is due once the consumer claimant meets the filing requirements; $500 for 1 arbitrator or $625 for 3 arbitrators if Case Filed by Business is due at the time the arbitration is filed.<br><br>**Case Management Fee (nonrefundable):** $1,400 for 1 arbitrator or $1,775 for 3 arbitrators will be assessed 60 days after the date the AAA sends correspondence communicating the "answer" due date to the parties or upon the appointment of the arbitrator, whichever comes first.<br><br>**Arbitrator Compensation:** $1,500 per case* | **Filing Fee (nonrefundable):** $300 for 1 or $425 for 3 arbitrators is due once the consumer claimant meets the filing requirements; $500 for 1 arbitrator or $625 for 3 arbitrators if Case Filed by Business is due at the time the arbitration is filed.<br><br>**Case Management Fee (nonrefundable):** $1,400 for 1 arbitrator or $1,775 for 3 arbitrators will be assessed 60 days after the date the AAA sends correspondence communicating the "answer" due date to the parties or upon the appointment of the arbitrator, whichever comes first.<br><br>**Hearing Fee:** $500<br><br>**Arbitrator Compensation:** $2,500 per day of hearing* per arbitrator |
|  | *A Desk/Documents-Only Case will not exceed document submissions of more than 100 pages in total and 7 total hours of time for the arbitrator to review the submissions and render the Award.<br><br>Beyond 100 pages and 7 hours of time, the business will be responsible for additional arbitrator compensation at a rate of $300 per hour. Arbitrator compensation is not subject to reallocation by the arbitrator(s) except as may be required by applicable law or upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous. | *The arbitrator compensation encompasses one preliminary conference, one day of in-person or telephonic hearing, and one final award. For cases with additional procedures, such as multiple telephone conferences, motion practice, post-hearing briefing, interim or partial awards, awards containing findings of fact and conclusions of law, or other processes not provided in the Rules, the business will be responsible for additional arbitrator compensation. Arbitrator compensation is not subject to reallocation by the arbitrator(s) except as may be required by applicable law or upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous. |

### (i) Filing Fees*

In cases before a single arbitrator where the consumer is the Claimant, a nonrefundable filing fee, capped in the amount of $200, is payable in full by the consumer when a case is filed unless the parties' agreement provides that the consumer pay less. A nonrefundable filing fee in the amount of $300 is payable by the business once the consumer claimant meets the filing requirements, unless the parties' agreement provides that the business pay more.

In cases before three or more arbitrators, where the consumer is the Claimant, a nonrefundable filing fee capped in the amount of $200 is payable in full by the consumer when a case is filed, unless the parties' agreement provides that the consumer pay less. A nonrefundable filing fee in the amount of $425 is payable by the business once the consumer claimant meets the filing requirements, unless the parties' agreement provides that the business pay more.

In cases where the business is the Claimant, the business shall be responsible for all filing fees. The nonrefundable filing fee is $500 for a single arbitrator or $625 for 3 arbitrators.

There shall be no filing fee charged for a counterclaim.

The AAA reserves the right to assess additional administrative fees for services performed by the AAA beyond those provided for in these Rules and which may be required by the parties' agreement or stipulation.

*Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA at 1-800-778-7879, if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003)

### (ii) Case Management Fees

A nonrefundable case management fee of $1,400 for 1 arbitrator or $1,775 for 3 arbitrators will be assessed to the business 60 days after the date the AAA sends correspondence communicating the "answer" due date to the parties or upon the appointment of the arbitrator, whichever comes first. Should the case close for any reason within 60 days of the "answer" due date communication and no arbitrator has been appointed, the case management fee will not be charged.

(iii) Neutral Arbitrator's Compensation

The business shall pay the arbitrator's compensation unless the consumer, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation.

- **Desk/Documents-Only Arbitration** – Arbitrators serving on a desk/documents-only arbitration will receive compensation at a rate of $1,500 per case. A desk/documents-only arbitration will not exceed document submissions of more than 100 pages in total and 7 total hours of time for the arbitrator to review the submissions and render the Award. Beyond 100 pages and 7 hours of time, the business will be responsible for additional arbitrator compensation at a rate of $300 per hour.

- **In-Person or Telephonic Hearing Arbitration** – Arbitrators serving on an in-person or telephonic hearing arbitration case will receive compensation at a rate of $2,500 per day of hearing per arbitrator. The arbitrator compensation encompasses one preliminary conference, one day of in-person or telephonic hearing, and one final award. For cases with additional procedures, such as multiple telephone conferences, motion practice, post-hearing briefing, interim or partial awards, awards containing findings of fact and conclusions of law, or other processes not provided in the Rules, the business will be responsible for additional arbitrator compensation.

Once a Preliminary Management Hearing is held by the arbitrator, the arbitrator is entitled to one-half of the arbitrator compensation rate. Once evidentiary hearings are held or all parties' documents are submitted for a desk/documents-only arbitration, the arbitrator is entitled to the full amount of the arbitrator compensation rate.

For in-person or telephonic hearing arbitrations, if an evidentiary hearing is cancelled fewer than 2 business days before the hearing, the arbitrator is entitled to receive compensation at the first day of hearing rate.

Any determination by the AAA on whether the business will be responsible for additional arbitrator compensation is in the sole discretion of the AAA and such decision is final and binding.

### (iv) Hearing Fees

For telephonic hearings or in-person hearings held, a Hearing Fee of $500 is payable by the business. If a case is settled or withdrawn prior to the hearing taking place, the Hearing Fee will be refunded, or cancelled if not yet paid. However, if the AAA is not notified of a cancellation at least two business days before a scheduled hearing, the Hearing Fee will remain due and will not be refunded.

There is no AAA hearing fee for an Administrative Conference (see R-10).

### (v) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains rental hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the business.

### (vi) Abeyance Fee

Parties on cases held as inactive for one year will be assessed an annual abeyance fee of $500. If a party refuses to pay the assessed fee, the opposing party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed. All filing requirements, including payment of filing and other administrative fees, must be met before a matter may be placed in abeyance.

### (vii) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the business.

### (viii) Consumer Clause Review and Registry Fee

Please note that all fees described below are **nonrefundable**.

For businesses submitting a clause, the cost of reviewing the clause and maintaining that clause on the Registry is $500. A yearly Registry fee of $500 will be charged to maintain each clause on the Registry for each calendar year thereafter.

If the AAA receives a demand for consumer arbitration from an arbitration clause that was not previously submitted to the AAA for review and placement on the Registry, the business will incur an additional $250 fee for the AAA to conduct an immediate review of the clause.

Any subsequent changes, additions, deletions, or amendments to a currently registered arbitration agreement must be submitted for review and a review fee of $500 will be assessed at that time.

### (ix) Reallocation of Arbitrator Compensation, AAA Administrative Fees and Certain Expenses

Arbitrator compensation, expenses as defined in sections (v) and (vii) in Costs of Arbitration section of the Rules and administrative fees (which include Filing and Hearing Fees) are not subject to reallocation by the arbitrator(s) except as may be required by applicable law or upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

# Procedures for the Resolution of Disputes through Document Submission

## D-1. Applicability

**(a)** In any case, regardless of claim size, the parties may agree to waive in-person/telephonic hearings and resolve the dispute through submission of documents to one arbitrator. Such agreement should be confirmed in writing no later than the deadline for the filing of an answer.

**(b)** Where no disclosed claims or counterclaims exceed $25,000, the dispute shall be resolved by these Procedures, unless a party asks for a hearing or the arbitrator decides that a hearing is necessary.

**(c)** If one party makes a request to use the *Procedures for the Resolution of Disputes through Document Submission* (Procedures) and the opposing party is unresponsive, the arbitrator shall have the power to determine whether to proceed under the Procedures. If both parties seek to use the Procedures after the appointment of an arbitrator, the arbitrator must also consent to the process.

**(d)** When parties agree to these Procedures, the procedures in Sections D-1 through D-4 of these Rules shall supplement other portions of these rules which are not in conflict with the Procedures.

## D-2. Preliminary Management Hearing

Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator shall convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

## D-3. Removal from the Procedures

**(a)** The arbitrator has the discretion to remove the case from the Procedures if the arbitrator determines that an in-person or telephonic hearing is necessary.

**(b)** If the parties agree to in-person or telephonic hearings after a previous agreement to proceed under the Procedures, the arbitrator shall conduct such hearings. If a party seeks to have in-person or telephonic hearings after agreeing to the Procedures, but there is not agreement among the parties to proceed with in-person or telephonic hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

### D-4. Time of Award

**(a)** The arbitrator shall establish the date for either final written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing, and the time for the rendering of the award shall commence on that day as well.

**(b)** The arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(c)** The award is subject to all other provisions of these Rules that pertain to awards.

## Glossary of Terms

### Administrator

The Administrator's role is to manage the administrative aspects of the arbitration, such as the appointment of the arbitrator, to make preliminary decisions about where hearings might take place, and to handle the fees associated with the arbitration. As Administrator, however, the Administrator does not decide the merits of a case or make any rulings on issues such as what documents must be shared with each side. Because the Administrator's role is only administrative, the Administrator cannot overrule or change an arbitrator's decisions or rulings. The Administrator will comply with any court orders issued from litigation involving the parties to the dispute.

### ADR Agreement

An ADR Agreement is an agreement between a business and a consumer to submit disputes to mediation, arbitration, or other ADR processes.

### ADR Process

An ADR (Alternative Dispute Resolution) Process is a method of resolving a dispute other than by court litigation. Mediation and Arbitration are the most widely used ADR processes.

### ADR Program

An ADR Program is any program or service set up or used by a business to resolve disputes out of court.

### Arbitration

In arbitration, the parties submit disputes to an impartial person (the arbitrator) for a decision. Each party can present evidence to the arbitrator. Arbitrators do not have to follow the Rules of Evidence used in court.

Arbitrators decide cases with written decisions or "awards." An award is usually binding on the parties. A court may enforce an arbitration award and the court's review of arbitration awards is limited.

## Arbitration Agreement

An arbitration agreement is a contract between parties to settle their disputes by binding arbitration. It is typically found in the parties' contract in a section entitled "Arbitration" or "Dispute Resolution." It gives the parties information about how they are choosing to settle any disputes that they might have.

## Arbitrator

Arbitrators are neutral and independent decision makers who are not employees of the administrator. Except where the parties to a case reach their own settlement, the Arbitrator will make the final, binding decision on the dispute and render it in writing, called the Award. The Arbitrator makes all the procedural decisions on a case not made by the administrator or not decided jointly by the parties. The Arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case.

Once appointed to a case, an Arbitrator may not be removed by one party without the other party's consent or unless the administrator determines an Arbitrator should be removed and replaced by another Arbitrator chosen by the administrator in a manner described in these Rules.

## Case Administrator

The Case Administrator is the AAA's employee assigned to handle the administrative aspects of the case. He or she does not decide the case. He or she manages the case's administrative steps, such as exchanging documents, matching schedules, and setting up hearings. The Case Administrator is the parties' contact point for almost all aspects of the case outside of any hearings.

## Claimant

A Claimant is the party who files the claim or starts the arbitration. Either the consumer or the business may be the Claimant.

## Demand for Arbitration (also referred to as "Demand")

The written document created by the claimant that informs the respondent that it wishes to arbitrate a dispute. This document provides basic information about the dispute, the parties involved and what the claimant wants as a result of the arbitration.

### Documents-Only Arbitration

In a Documents-Only Arbitration, the parties submit their arguments and evidence to the arbitrator in writing. The arbitrator then makes an award based only on the documents. No in-person or telephone hearing is held.

### Independent ADR Institution

An Independent ADR Institution is an organization that provides independent and impartial administration of ADR programs for consumers and businesses. The American Arbitration Association is an Independent ADR Institution.

### In-Person Hearing

During an In-Person Hearing, the parties and the arbitrator meet in a conference room or office and the parties present their evidence in a process that is similar to going to court. However, an In-Person Hearing is not as formal as going to court.

### Mediation

In Mediation, an impartial person (the mediator) helps the parties try to settle their dispute by reaching an agreement together. A mediator's role is to help the parties come to an agreement. A mediator does not arbitrate or decide the outcome.

### Neutral

A "Neutral" is a mediator, arbitrator, or other independent, impartial person selected to serve as the independent third party in an ADR process.

### Party

The party is the person(s) or business that is involved in the dispute in the arbitration process. Usually, these are the people or businesses that have an arbitration agreement between them that specifies that a dispute should be resolved by arbitration.

## Parties

Parties are all the separate individuals, businesses, or organizations involved in the arbitration.

## Opposing Party

The opposing party is the other party that is on the opposite side of the arbitration from you. If you are the claimant, the Opposing Party is the respondent. If you are the respondent, the Opposing Party is the claimant. If you are the consumer, the Opposing Party is the business. If you are the business, the Opposing Party is the consumer.

## Respondent

The respondent is the party against whom the claim is filed. If a Respondent states a claim in arbitration, it is called a counterclaim. Either the consumer or the business may be the Respondent.

## Telephone Hearing

In a Telephone Hearing, the parties have the opportunity to tell the arbitrator about their case during a conference call. They also present their evidence to the arbitrator during the call. Often this is done after the parties have sent in documents for the arbitrator to review.

Case 1:20-cv-00028-TJK   Document 10-5   Filed 03/27/20   Page 47 of 86

*© 2018 American Arbitration Association®, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*



800.778.7879 | websitemail@adr.org | adr.org

DECLARATION OF NANDAN M. JOSHI

EXHIBIT 4

Tickets and Passes

Fares, Modifications and Refunds

Baggage Information

Terms of Transportation

Accessible Travel Services

Amtrak Wallet

Local Transportation

Force Majeure Event

Disclaimer of Liability

Alexa Skills App

Arbitration Agreement

Amtrak Guest Rewards Program

## Terms and Conditions



Version 2.7.2
Mar. 13, 2020

March 13, 2020 – Added Illness Waiver Policy.

March 1, 2020 - Updated fare rules for Saver Fares and Value Fares.

These terms and conditions contain a binding Arbitration Agreement below. Please read the Arbitration Agreement carefully because it applies mutually to You and Amtrak and requires that you resolve claims and disputes with Amtrak on an individual basis through arbitration and not by way of court or jury trial. By purchasing a ticket for travel on Amtrak, You are agreeing to these terms and conditions and agreeing to the Arbitration Agreement.

## Tickets and Passes

### Amtrak Guest Rewards Points Redemptions

- Redemption travel may not be reserved unless a sufficient point balance is available in the member's Amtrak Guest Rewards account at the time of booking.
- Points may be redeemed for travel in the name of passengers other than the member, but tickets and travel documents are non-transferable once issued.
- Only one child (age 2-12) may be redeemed at half the rail fare for each adult in the reservation.
- Infants (under age 2) may travel without a ticket, but if a separate seat is desired for an infant, points must be redeemed according to the child rate policy.
- Redemption travel may not be bartered, brokered, purchased or sold, except under programs fully authorized and/or sponsored by Amtrak. A redemption ticket has no cash value.

### Passengers with Disabilities

- Online reservations for passengers with a disability, including reservations for accessible space and/or seating, are currently limited to one-way and round-trip train travel only for one adult or child passenger with a disability and up to one discounted companion.
- Discounts are not combinable with other discounts (such as Senior, Rail Passengers Assocition, etc.) and promotions, unless such discounting is expressly described in the terms and conditions of a particular program.
- To receive a discounted ticket, written documentation of a passenger's disability must be presented at the ticket counter and when boarding the train.
- At the time of travel, passengers with a disability who travel in an accessible bedroom will be required to certify that they require one or more of the accessible features of the accessible bedroom in order to book and receive the discount.
- Amtrak train crews are not required or permitted to provide personal care assistance to passengers with a disability. It is the passenger's responsibility to travel with a companion/attendant as necessary.
- Wheeled mobility devices should not exceed 30 in (76 cm) wide and 48 in (122 cm) long and should have a minimum of 2 in (5 cm) of ground clearance. The weight limit for an occupied wheeled mobility device is 600 lbs. (273 kg). Amtrak permits both manually operated and battery powered wheeled mobility devices.
- To make reservations on the Auto Train (Lorton, VA to Sanford, FL), Downeaster (Boston, MA to Portland, ME) or Thruway connecting service (bus, ferry, taxi, etc.), or if you're traveling with more than one adult or with children/infants, call 1-800-USA-RAIL or TTY 1-800-523-6590 for assistance.

Accessibility

Multi-Ride Tickets

- Monthly tickets are non-transferable.
- Six-ride tickets are non-transferable.
- Monthly tickets will be canceled automatically, and refund limits will be imposed, if tickets are not picked-up on or before the first day of the valid travel month.
- Ten-ride tickets are non-transferable on most routes, On Pacific Surfliner, Heartland Flyer and Amtrak Cascades (between Eugene, OR and Portland, OR only), more than one person may use a ten-ride ticket at one time.
- Seating is limited. Seats may not be available on all trains at all times.
- Reservations are not permitted.

## Multi-Ride Restricted Trains

Multi-ride tickets are not valid on the following trains:

- Acela (all trains)
- Northeast Regional
  - Trains 135, 156
  - Trains 83, 93 - Not permitted between New York City & Philadelphia, PA and intermediate cities.
  - Trains 84, 87, 94, 95, 194 - Not permitted between New London, CT & Washington, DC and intermediate cities.
- California Zephyr 5, 6
- Cardinal 50, 51
- Carolinian
  - Trains 79, 80 - Not permitted between New York City & Washington, DC and intermediate cities.
- City of New Orleans 58, 59
- Coast Starlight 11, 14
- Crescent 19, 20
- Empire Builder 7, 8, 27, 28, 807, 808
- Lake Shore Limited 48, 49
- Palmetto
  - Trains 89, 90 - Only permitted between New York City & Washington, DC and intermediate cities.
- Silver Meteor 97, 98
- Silver Star 91, 92
- Southwest Chief 3, 4
- Vermonter
  - Train 56 - Not permitted between New York City & Philadelphia, PA and intermediate cities.

## USA Rail Pass

- The USA Rail Pass is not a ticket and is not valid for travel; it is used to obtain all tickets for travel.
- When traveling on a USA Rail Pass, you must have a ticket and a reservation for each train you board, You must make reservations and pick up your ticket(s) before boarding any train.
- The USA Rail Pass entitles you to travel in regular Coach class seats. On some trains, you can upgrade your Coach seat to Business class or Sleeping Car accommodations for the appropriate surcharge.
- After you purchase your USA Rail Pass, you have one year to exchange it for a paper USA Rail Pass and begin travel.
- Travel must begin within 180 days of the date the pass is issued.
- Once you are issued a paper USA Rail Pass, you have 330 days to complete your travel.
- Once your first travel segment is reserved, you must complete your travel within the selected travel duration of the pass. The travel duration period begins on the first date of travel, not the date on which the reservation was made.
- All travel must be completed within 180 days of reserving the first travel segment or within the selected travel duration of the pass once the first travel segment is reserved, whichever comes first.
- The USA Rail Pass is valid for travel on all Amtrak trains except Auto Train, Acela, Thruway bus connections (7000-7999 series), and the Canadian portion of trains operated jointly by Amtrak and VIA Rail Canada.
- Tickets obtained with the pass are not valid for travel unless the pass is also presented. Reservations and tickets are required for all travel segments prior to boarding. Fares paid onboard will not be refunded.
- Travel is restricted to four one-way trips between two cities, and to all cities in between, over the same route.
- USA Rail Pass prices are subject to change and are not guaranteed until actual travel reservations are made.
- The USA Rail Pass may not be combined with other offers, discounts or promotions.
- The USA Rail Pass is not available for purchase onboard trains.
- The USA Rail Pass is non-transferable.

## Fares, Modifications and Refunds

### About Fares

Amtrak will exercise reasonable efforts to ensure that all published fares are accurate and available for sale, but Amtrak reserves the right to correct any erroneously published fare that Amtrak did not intend to offer for sale. In the event that an erroneous fare is inadvertently published for sale and a ticket is issued at the erroneous fare before it has been corrected, Amtrak reserves the right to cancel the ticket purchase and refund all amounts paid by the purchaser or, the purchaser's option, to reissue the ticket for the correct fare.

- Amtrak reserves the right to limit the number of coach seats and accommodations sold at any excursion, special or discounted fare.
- On reserved trains, a range of fares may apply. Amtrak will quote and price your travel at the lowest fare available at the time you make your reservation.
- On unreserved trains, the lowest fares may be restricted during peak travel periods.
- Changes to your itinerary may affect the fare, and a fee may apply when tickets are reissued.
- Some discount fares may require purchase in advance of travel and may be non-refundable.
- Fares are not guaranteed until we provide you with a reservation confirmation.
- Fares, routes and schedules are subject to change without notice.

For all fares, full refund if changed or canceled within 24 hours of purchase, regardless of time elapsed between purchase and scheduled departure (within one hour for unreserved tickets).

Accessibility

### Saver Fares

Saver Fares are the lowest available and deeply-discounted fares, are limited in availability and require advance purchase.

Saver fares are available in Reserved Coach and Acela Business class.

- **Refunds**: Non-refundable 24 hours or more after booking.
- **No changes or upgrades allowed**
- Upgrade coupons not allowed
- Passenger type and promotional discounts are not valid with Saver Fares.

## Value Fares

Available on all Amtrak routes, Value Fares offer several refund options and are the regular rate for fares. Like Saver Fares, the availability of Value Fares is limited.

Value fares are available in Unreserved Coach, Reserved Coach and Acela Business class.

- **Refunds**: Full refund to original form of payment or eVoucher with no fees if canceled 15 days or more before departure. 25% fee charged if canceled less than 14 days before departure. Unreserved tickets incur 25% fee if canceled an hour or more after purchase.
- **Changes**: No fee if changed 15 days or more before departure. 15% fee may be charged if canceled less than 14 days before departure. No change fee for unreserved tickets.
- Change fee waived for Select Executive members

## Flexible Fares

Flexible fares are available in Unreserved Coach, Reserved Coach and Acela Business class.

- **Refunds**: Full refund to original form of payment or eVoucher with no fees if canceled before departure.
- **No change fee**

## Business Class Fares

Business fares are available only in Non-Acela Business class.

- **Refunds**: Full refund to original form of payment or eVoucher with no fees if canceled before departure.
- **No change fee**

## Premium Fares

Premium Services include Acela First class and sleeper accommodations.

### Acela First class

- **Refunds**: Full refund to original form of payment or eVoucher with no fees if canceled before departure.
- **No change fee**

### Sleeper Accommodations

- **Refunds**: Refund to original form of payment with 25% fee if canceled 15 or more days before departure. Within 14 days of departure only refundable to non-refundable eVoucher with a 25% cancellation fee.
- **No change fee**

## "No Show" Policy

A "no-show" is defined as a passenger's failure to travel on a segment from its origin without first canceling that portion of the itinerary.

For all types of tickets, if your travel plans change and you do not modify or cancel your reservation before departure and then do not board your train, your entire reservation will be canceled, including all subsequent segments in the itinerary, and any remaining funds or points for that trip will be forfeited.

## Refund Calculations

There are two options for receiving a refund when canceling your Amtrak reservation:

1. Receive an eVoucher to apply as payment toward future trip purchases
2. Refund to the original form of payment

The cancellation policy for paid reservations (one-way, roundtrip or multi-city) is based on the type of fare purchased: Saver, Value, Flexible, Business, and Premium.

Cancellation fees have a minimum of $5.00 and a maximum of $250.00 per transaction (maximum of $250.00 does not apply to monthly or multi-ride tickets).

An Amtrak ticket becomes non-refundable, not valid for carriage and has no exchange value, after one year from the date payment was made for that ticket (or other period if so endorsed on the ticket). An eVoucher or other exchange credit is valid for one year from date of issue.

If a customer does not take the entire trip paid for, the remaining ticket value is calculated by subtracting the fare for any travel already taken from the total amount paid. The refund policy applies as soon as payment is made, whether or not any ticket is printed, and applies to entire fare paid including both rail fare and any accommodation charge. The Amtrak refund and cancellation policy is subject to change at any time.

eTickets and tickets purchased through other prepaid programs are considered "paid for" and subject to the refund and cancellation policies of any component rail fare, customer type discount, and/or promotional discount, even if paper value tickets have not yet been printed.

## Reward Ticket Cancellations and Modifications

### One-Way, Round-Trip or Multi-Segment Reward Travel

- **Cancellati**     _Accessibility_     nts penalty is assessed for any refund (redeposit) to the Member account. If canceling a non-sleeper ticket within 24 hours prior to departure, or a sleeper ticket within 14 days prior to departure, an additional "close-in" penalty of 10% of the points redeemed will be collected (waived for Select Executive members)

Executive members).

- **Modifications**: A points difference (to new, prevailing fare) will apply in all cases with a 10% points penalty withheld on any fare difference returned to member. If modifying a non-sleeper ticket within 24 hours prior to departure, or a sleeper ticket within 14 days prior to departure, an additional "close-in" penalty of 10% of the points redeemed will be collected (waived for Select Executive members).

## Multi-Ride (Six-Ride, Ten-Ride) Reward Tickets

- **Cancellations**: Points are refunded minus a 10% points penalty if unused and unexpired. Points are non-refundable if first trip is used or if ticket is expired.
- **Modifications**: Before first ride, a full exchange in point value will be issued without penalty. No exchange in point value after first ride or after expiry—whichever comes first.

## Monthly Pass Reward Travel

- **Cancellations**: Points are refunded minus a 10% point penalty prior to first day of valid month. Redemption is non-refundable on or after first day of valid month.
- **Modifications**: Full exchange in point value prior to valid month. No exchange in point value on or after first day of valid month.

A "no-show" for any segment will result in forfeiture of points and travel for that segment, as well as all subsequent segments in the itinerary.

## Multi-Ride Ticket Cancellations

A cancellation fee applies to all multi-ride refunds. Refunds may be restricted if the multi-ride ticket was paid for with a tax-free transit subsidy.

## Monthly Ticket Refund Policy

Refund before valid month and zero rides (lifts) taken

- Full refund, less 25% cancellation fee
- 75% exchange value

Refund day 1-10 of valid month

- 50% refund, less 25% cancellation fee
- 50% exchange value, less 25% cancellation fee

Refund on or after day 11 of valid month

- Non-refundable
- No exchange value

## Ten-Ride and Six-Ride Ticket Refund Policy

Zero rides (lifts) taken

- Full refund, less 25% cancellation fee
- 75% exchange value

One or more rides (lifts) taken

- Non-refundable
- No exchange value

## USA Rail Pass Refunds

- The USA Rail Pass is only refundable before travel begins. Once travel has begun the pass may not be exchanged or refunded.
- A full refund will be given if canceled within 1 hour of purchase.
- A 25% cancellation fee will be applied if canceled prior to the issuance of tickets or at least two days before the scheduled departure.
- If not canceled two days before the scheduled departure, the ticket is forfeited, and no funds can be applied toward future travel.
- The pass, and all tickets issued with the pass, must be turned into an Amtrak ticket agent no later than two days before the date of the first use written on the pass.
- Substantial cancellation fees apply when sleeping accommodations are canceled less than 15 days in advance.
- Lost or stolen USA Rail Passes are not refundable or replaceable after travel begins.

## Illness Waiver Policy

When a passenger requests to change or cancel his or her travel plans due to an illness and upon presentation of a doctor's note, Amtrak will modify or waive fare change and refund policies that would have normally applied to that change or cancellation had it been made voluntarily. This waiver will apply to all persons in the ill passenger's party.

## eVouchers

In certain situations when you downgrade or cancel a trip, you can receive some or all of your money back in the form of an eVoucher. eVouchers store your ticket value electronically in our reservation and ticketing system, ready for you to apply as payment toward future trip purchases.

## Downgrade Exchange

An eVoucher that has been created by a downgrade exchange is refundable if the associated fare rules allow but will be subject to a 25% cancellation fee.

## Downgrade Modification and Cancellation

When you cancel or modify a paid reservation before the scheduled departure (and the modified fare is lower), any residual value that is non-refundable or cannot be immediately refunded will be automatically transferred to an eVoucher. Refundability, if any, is determined by the rules of the fare paid. Penalties for non-cancellation of sleeping accommodations, non-Acela Business class seating and Acela First class seating, will apply

## Downgrade or Cancellation due to an Amtrak Initiated Change

If Amtrak makes a schedule change, an equipment substitution or cancellation and the new accommodation charge or rail fare is lower as a result, an eVoucher will be created to hold any residual value. A cancellation fee or non-cancellation penalty will not apply to the refundable amounts in this eVoucher.

Accessibility

### eVoucher Owner

The funds in an eVoucher will be held in the name of the Primary Passenger of the original reservation (the first passenger listed in a reservation). An eVoucher can only be redeemed by the person whose name appears on it; however, that person can choose to apply it to someone else's travel.

### Buying or Transferring eVouchers

eVouchers that are bought, sold, auctioned or transferred to or from a third party are prohibited and the value will be confiscated and voided, and travel will not be permitted. By redeeming an eVoucher, the passenger named on the eVoucher acknowledges the content of these Amtrak.com terms and conditions and agrees to abide by them.

### eVoucher Expiration

An eVoucher will expire one year after issuance. A refundable amount left in an eVoucher can be refunded up to the refund expiration date of the eVoucher; this date is based on when initial payment was made for the original travel and may be less than one year after issuance.

### Refunding an eVoucher

Depending on the fare rules and terms of the original ticket purchase, funds in an eVoucher can be:

- **Refundable**: returned as a refund check through an Amtrak Refund office only or credited back to the credit card used to pay for the original ticket. There will be a 25% cancellation fee if the return of a paper value ticket created the eVoucher.
- **Non-refundable**: cannot be refunded as money back but can be used to pay for future travel.
- A combination of refundable and non-refundable amounts.

The value of an eVoucher used as a form of payment is non-refundable (e.g., an eVoucher is redeemed to pay for a ticket). If a reservation that was paid for by eVoucher is canceled or downgraded, the value will be stored in a new, non-refundable eVoucher in the name of the Primary Passenger of the new reservation.

### Duplicate and Impossible Bookings

Duplicate and impossible bookings are prohibited without prior authorization from Amtrak

**Duplicate bookings** include, but are not limited to, reservations on multiple trains by the same passenger on the same day between the same or similar cities on one or more itineraries, such as booking the 4:00 pm, 5:00 pm and 6:00 pm Acela trains between New York and Philadelphia.

**Impossible bookings** are reservations on trains for which it is impossible for the passenger to travel on both or all, such as a bedroom Seattle - Chicago on two consecutive days, or two separate reservation records between which a connection is not possible. Amtrak reserves the right to analyze its reservation system to find such bookings and will attempt to contact the passenger in advance to determine which one will be used; if unable to contact the passenger, Amtrak will retain the last reservation booked and cancel the others, whether or not paid for. Refunds for such cancellations will be determined by the refund rules that apply to the fare paid.

### Boarding Late, Leaving Early or Downgrading

No refund or exchange credit is given if a passenger boards a train at a station beyond, or detrains at a station before, the station from or to which they were reserved, or if the passenger downgrades accommodations on the train. To receive a fare adjustment the passenger must change the reservation before the train departs the original boarding station of that train. This restriction will not apply if there is a service disruption. Passengers who downgrade accommodations or reduce the number in their party on board trains must obtain a Refund Authorization Form from the conductor.

### Gift Card Reservations

If you paid for tickets with an Amtrak gift card and wish to cancel, modify or downgrade your reservation, credit will be provided as an eVoucher. The type of eVoucher you receive will correspond to the type of fare purchased.

## Baggage Information

### About Baggage

All baggage should be tagged with your name, address and phone number. Free ID tags are available at all of our stations.

- Amtrak reserves the right to deny transport or charge a fee for items exceeding baggage policy limitations.
- Carry-on and checked baggage policies on the 7000 and 8000 series Amtrak Thruway Services are determined by the operating carrier and may vary from those of Amtrak.

### Carry-On Baggage

Each passenger may bring 2 carry-on bags and 2 personal items free of charge.

- Carry-on Bags not to exceed 50 lbs. (23 kg) and 28 x 22 x 14 inches each. On Pacific Surfliner trains not to exceed 28 x 22 x 11 inches.
- Personal items not to exceed 25 lbs. (12 kg) and 14 x 11 x 7 inches each.
- Excess bags: A $20 excess baggage fee will be charged for each carry-on and personal item above the quantity and size limits.
- Passengers traveling with infants under the age of two may bring an additional infant item onboard (stroller, diaper bag), which does not count toward the carry-on baggage or personal item limit.
- Carry-on and personal items must be kept with you, stored in overhead racks, under seats or designated baggage areas. Do not store items in empty seats, aisles, vestibules or other areas where they may cause annoyance to other passengers or present a safety hazard.

### Checked Baggage

Each passenger can check two bags free of charge. Not all trains or locations are equipped to handle checked baggage.

- Checked bags not to exceed 50 lbs. (23 kg) and 75 linear inches each.
- 2 additional checked bags are allowed: $20 each
- Oversized b            0 linear inches): $20 each
- Overweight bags must be repacked to under 50 lbs.

Linear inches = length + width + height

## Special and Prohibited Items

The following special and prohibited items list is not exhaustive. Any item that is similar to a listed prohibited item, even if not specifically mentioned, is also prohibited. Amtrak personnel may determine if an item not mentioned in this list is prohibited.

### Animals

- <u>Carry-On</u>: Allowed
- <u>Checked</u>: Not allowed
- Service animals are allowed onboard.
- Pets are allowed onboard select trains with the purchase of a ticket.
- See more details about pets and animals.

### Archery Equipment

Bows of any type, arrows, archery supplies

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Allowed - up to 50 lbs. and 75 linear inches
- Archery equipment may be checked free of charge in lieu of a piece of baggage.
- Archery equipment must be transported in a suitable hard case container.
- If a second hard case container is used, it will count as an additional checked baggage item.

### Batteries

Batteries used in motorized wheel chairs or similar devices for the mobility-impaired are allowed.

- <u>Carry-On</u>: Not allowed - batteries with acid that can spill or leak
- <u>Checked</u>: Not allowed - batteries with acid that can spill or leak

### Baby Items

Booster seats, car seats, folding strollers

- <u>Carry-On</u>: Allowed - up to 50 lbs.
- <u>Checked</u>: Allowed - up to 50 lbs. and 100linear inches.
- Baby items will be allowed onboard or in checked baggage service in lieu of a piece of baggage; no service fees apply.
- Carriages, active strollers, all terrain strollers, multi-child strollers may be required to be checked.

### Bicycles and Bicycle Trailers

- <u>Carry-On</u>: Allowed - up to 50 lbs. Maximum tire width 2".
- <u>Checked</u>: Allowed - up to 50 lbs. and 70" x 41" x 8.5"
- Bicycles/bicycle trailers may be checked in a bicycle container for $10, in lieu of a piece of baggage. Bicycle boxes are sold at most staffed locations for $15 per box. Customers may supply their own bicycle container. Recumbent, tandem and special bicycles over the standard bicycle dimensions and will not fit in a standard bicycle box are prohibited.
- Folding bicycles under the dimensions of 34" x 15" x 48" will be allowed onboard all trains in lieu of a piece of carry-on baggage. They must be considered a true folding bicycle.
- Full-size bicycles may be carried on certain trains with designated carry-on or trainside bicycle service. Bicycles must be stowed in the designated space within the body of the car.
- Passengers utilizing the carry-on bicycle service, where bikes are carried on select trains by the passenger and stored in designated areas, must be able to fully handle their bicycle, and be able to lift their bicycle to shoulder height. Passengers are responsible for stowage and security of bicycles.
- Passengers utilizing the trainside bicycle service, where bikes are transported on select trains in racks in the baggage car, must be able to lift their bicycle to shoulder height so Amtrak personnel may store and secure them in the bike racks.
- Electric bicycles under 50 lbs. are allowed in checked baggage and on trains with walk-on bicycle service.
- Gas-powered motorized bicycles are prohibited.

### Canisters, tanks or other devices containing propellants

Oxygen equipment for medical reasons is allowed onboard with restrictions.

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Not allowed

### Corrosive or dangerous chemicals or materials

Including, but not limited to, liquid bleach, tear gas, radioactive and harmful bacteriological materials.

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Not allowed

### Firearms or ammunition

Black powder, percussion caps or any ammunition used with a matchlock, flintlock, percussion-cap ignition system or similar type are never permitted; this includes self-loaded, gunpowder-based modern ammunition.

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Allowed -  with restrictions
- See more details about firearms.

### Fragile and/or valuable items

Including but not limited to credit cards, electronic equipment, jewelry, identification, and money. Amtrak accepts no liability for theft or damage for any items brought onboard.

Accessibility

- <u>Carry-On</u>: Allowed

- Checked: Not allowed

General Sporting Equipment

Balls, bats, cleats, fishing poles, helmets, pads, rackets, roller blades, skate boards, sticks (hockey/lacrosse). Allowance varies by sport

- Carry-On: Allowed - up to 50 lbs. and 28" x 22" x 14".
- Checked: Allowed - up to 50 lbs. and 75 linear inches. Oversized items (76-100 linear inches): $20 per item.
- Equipment not specified as weapons or hazardous will be allowed onboard free of charge in lieu of a piece of baggage.
- Equipment may also be checked in lieu of a piece of baggage.

Golfing Equipment

- Carry-On: Allowed - up to 50 lbs.
- Checked: Allowed - up to 50 lbs. and 100 linear inches.
- Passengers must make carry-on golf bag reservations per bag prior to boarding the train.
- Golf clubs must be carried in a bag or case that includes a cover that prevents the clubs from falling out. The bag, case or cover must be securely fastened by zippers or other fasteners. The passenger's name, address and phone number must be on a tag that is attached to the golf bag.
- Passengers may check golf bags at stations that offer checked baggage. Golf bags are only accepted at stations that offer checked baggage or aboard trains that accept golf bags as carry-on baggage.
- Golf carts are not accepted.

Household and automotive items

Including but not limited to antiques, appliances, artwork, furniture, machinery and car parts, powered tools, silverware, tires, and tow bars.

- Carry-On: Not allowed
- Checked: Not allowed

Hoverboards

Prohibited in stations and on platforms. Also, not permitted in vehicles on the Auto Train.

- Carry-On: Not allowed
- Checked: Not allowed

Incendiaries

Including but not limited to flammable gases, liquids, fuels, fireworks and other explosive devices.

- Carry-On: Not allowed
- Checked: Not allowed

Martial-arts and self-defense items

Including but not limited to billy clubs, nightsticks, and nunchuks.

- Carry-On: Not allowed
- Checked: Not allowed

Required Medical Devices

Common/powered wheelchairs, scooters, oxygen equipment, canes, walkers. dry ice for medication

- Carry-On: Allowed - up to 50 lbs., 30" wide x 48" long and 2" ground clearance.
- Checked: Allowed - up to 50 lbs. and 100 linear inches.
- Required medical devices will not count towards a passenger's allowable baggage and will be accepted free of charge if accompanied by a ticket issued at a mobility impaired fare.
- For oxygen equipment, the total weight of all tanks must not exceed 120 lbs.; within the limit will be allowed two 50 lb. tanks, six 20 lb. tanks, or any number of tanks that weigh less than 20 lbs. each up to 120 lbs.
- Wheeled mobility devices brought onboard must not exceed 600 lbs., including the passenger.
- Items that are not required onboard may be checked if accompanied by a ticket issued at a mobility-impaired fare. For items over 50 lbs., call 1-800-USA-RAIL to make shipping arrangements.

Dry Ice

Amtrak allows dry ice in checked baggage or carry-on baggage as long as it meets the following conditions:

- Must be clearly and visibly marked "dry ice" or "Carbon dioxide solid."
- Must visibly display the net weight of dry ice (5 pounds or under).
- Must not be checked onboard the train without the passenger being ticketed.
- Must not be packed to conceal any organic or inorganic item normally prohibited on Amtrak trains.
- Must be declared by the passenger prior to boarding.
- Must be properly packed to allow the venting of carbon dioxide gases which could build up and cause a compromise of the container.
- Must not be packed in a Styrofoam container.
- If a passenger carries a dry ice container, the container must meet all of the conditions mentioned above, as well as the container must remain with the passenger or the passenger's party at all times while onboard the train.
- The dry-ice container will count as part of the two personal allowable items that can be carried onboard the train.

A customer service representative or other Amtrak agent must conduct a visual inspection of the container to confirm it is properly marked and ensure the container does not contain any cuts, cracks, stains, or leakage (venting excluded).

Musical Instruments

Small musical instruments (flutes, small trumpets and harmonicas). Medium-sized musical instruments (guitars, trumpets and small saxophones). Oversized musical instruments (cellos, bass violins, bass saxophones and tubas).

- Carry-On: A Accessibility 50 lbs. and 28" x 22" x 14". Oversized - no larger than 72" in height.
- Checked: Allowed - up to 50 lbs. and 100 linear inches.

- Smaller instruments may be packed with the passenger's luggage to be adequately protected from damage.
- In lieu of a piece of baggage, medium-sized musical instruments may be transported for a $10.00 service fee.
- Instruments that do not fit in luggage racks will be considered oversize.
- Oversize instruments may only be carried onboard with the purchase of an additional full revenue seat.

## Overweight items

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Not allowed

## Perishables

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Not allowed

## Sharp objects

Sharp objects include, but are not limited to axes, ice picks, knives, spears, and swords.

- <u>Carry-On</u>: Not allowed
- <u>Checked</u>: Not allowed
- Scissors, nail clippers, corkscrews, and razors are allowed in carry-on baggage.
- Sheathed equipment, to include fencing equipment, are allowed in checked baggage.

## Skis and Snowboards

Snow skis, water skis, snowboards, poles, boots

- <u>Carry-On</u>: Yes - up to 50 lbs. and 72" in height.
- <u>Checked</u>: Yes - up to 50 lbs. and 75 linear inches. Oversized items (76-100 linear inches): $20 per item.
- Skis/snowboards may be carried onboard or checked free of charge in lieu of a piece of baggage.
- Skis/snowboards must be enclosed in a full-length protective cover (vinyl/cloth/nylon/or hard-sided case).
- Ski bags for transport are available at most staffed locations.

## Surfboards, Wakeboards and Skegs

- <u>Carry-On</u>: Allowed (Pacific Surfliner only) - up to 50 lbs. and 72" in height
- <u>Checked</u>: Allowed - up to 50 lbs. and 120" in height (72" on Pacific Surfliner)

- A $10 fee will apply to surfboards/wakeboards transported in checked baggage on all trains.
- Whether checked or carried on, surfboards/wakeboards must be enclosed in a full-length protective cover (vinyl/cloth/nylon/or hard-sided case).

Surfboards/wakeboards of any length may not be carried onboard most Amtrak trains. There is a limited exception for passengers traveling on the west coast in equipment designated as Pacific Surfliner.

- Surfboards/wakeboards may be carried onboard in lieu of a piece of baggage free of charge on Pacific Surfliner equipment only.
- Surfboards/wakeboards must be stowed in the overhead racks.

## Firearms

Amtrak accepts reservations of firearms and ammunition for carriage between Amtrak stations and on Amtrak trains within the United States that offer checked baggage service. Thruway Bus Services are not be included in this service. The following policies are in effect:

- Notification that the passenger will be checking firearms/ammunition must be made no later than 24 hours before train departure by calling Amtrak at 800-USA-RAIL. Online reservations for firearms/ammunition are not accepted.
- Passengers must travel on the same train that is transporting the checked firearms and/or ammunition.
- All firearms and/or ammunition must be checked at least 30 minutes prior to scheduled train departure. Some larger stations require that baggage be checked earlier. Call 1-800-USA-RAIL for more details.
- All firearms (rifles, shotguns, handguns, taser guns, starter pistols) must be unloaded and in an approved, locked hard-sided container not exceeding 62" L x 17" W x 7" D (1575 mm x 432 mm x 178 mm). The passenger must have sole possession of the key or the combination for the lock to the container. The weight of the container may not exceed 50 lbs./23 kg.
- Smaller locked, hard-sided containers containing smaller unloaded firearms such as handguns, taser guns and starter pistols must be securely stored within a suitcase or other item of checked baggage, but the existence of such a firearm must be declared.
- All ammunition carried must be securely packed in the original manufacturer's container; in fiber, wood, or metal boxes; or in other packaging specifically designed to carry small amounts of ammunition. The maximum weight of all ammunition and containers may not exceed 11 lbs./5 kg.
- The passenger is responsible for knowing and following all federal, state, and local firearm laws at all jurisdictions to and through which he or she will be travelling.
- All other Amtrak checked baggage policies apply, including limits on the number of pieces of checked baggage, the maximum weight of each piece (50 lbs./23 kg).
- Firearms/ammunition may not be carried in carry-on baggage; therefore, checked baggage must be available on all trains and at all stations in the passenger's itinerary.
- At the time of check-in, passengers will be required to complete and sign a two-part Declaration Form.
- BB guns and Compressed Air Guns (to include paintball markers), are to be treated as firearms and must comply with the above firearms policy. Canisters, tanks, or other devices containing propellants must be emptied prior to checking and securely packaged within the contents of the passenger's luggage.

Passengers failing to meet the above-mentioned requirements for checking firearms will be denied transportation.

## Baggage and Vehicles on Auto Train

We do not offer checked baggage service on the Auto Train. You may pack baggage inside your vehicle; however, you may not access your vehicle en route. Carry-on baggage guidelines apply to the Auto Train.

## Luggage and Bicycle Racks

All luggage, luggage Accessibility bicycles must be removed from the top of your vehicle and stored inside the vehicle before it may be boarded on the Auto Train. Bicycles cannot be brought onboard.

Roof-Mounted Racks

We cannot carry vehicles with temporary luggage racks or bicycle racks attached to the roof. Factory-installed roof racks are permitted but must remain empty during the trip.

Rear-Mounted Bicycle Racks

Bicycles can remain in bicycle racks attached to the back of the vehicle only. You must sign a loss or damage waiver for bicycles transported on the back of the vehicle.

## Vehicle Responsibility

Transportation of vehicles and their contents via Auto Train is subject to special rules and regulations contained in tariffs, which are available for inspection at any Amtrak ticket office.

Personal effects and baggage remaining in your vehicle during transit are solely your responsibility. Amtrak is unable to accept responsibility for these items. In the unlikely event of damage to your vehicle in transit or during loading or unloading, Amtrak will accept responsibility only if you report the damage to an authorized Amtrak representative before leaving the terminal; the Amtrak representative must determine that the damage occurred while the vehicle was in Amtrak custody.

## Limitations of Liability for Baggage

Amtrak accepts no liability for the following:

### Carry-On Baggage

Amtrak disclaims all liability for carry-on baggage, including special items, even if Amtrak personnel have handled or assisted in loading or unloading the baggage.

### Checked Baggage

Amtrak disclaims all liability for:

- Missing or stolen items inside unlocked or unsecured baggage.
- Minor damages to baggage considered normal wear and tear (despite reasonable care when handling).
- Baggage that was transported without travel of the owner of the items via Amtrak or payment of the applicable storage charges.
- Loss or damage to prohibited baggage items, items packed with prohibited items and baggage containing prohibited items.

## Liability Amount

- For any checked baggage handled in Red Cap service, Amtrak's liability is limited to $50.00 per bag (or bag equivalent) for any loss or damage.

- For any checked baggage stored in Parcel Check service, Amtrak's liability is limited to $100.00 per bag (or bag equivalent) for any loss or damage. Additional valuation cannot be declared.
- For checked baggage, Amtrak's liability is limited to a maximum of $500 per ticketed passenger. Passengers may declare additional valuation, up to $2,500, upon payment of the applicable charge.
- For special items, including bicycles, Amtrak disclaims liability for any special items carried onboard or any bicycles accepted in the baggage area not packed within a bicycle box.

Claims for damaged baggage or stolen items must be reported at the location where the baggage is claimed, before the passenger leaves the station. Claims for lost checked baggage must be submitted within 30 days of the date of the incident to the Office of Customer Relations (Attn: Baggage Claims, Amtrak, 1 Massachusetts Ave NW, Washington, DC 20001).

# Terms of Transportation

## Carriage of Passengers

A ticket shall be valid for carriage or refund one year after date of purchase, unless otherwise provided.

Reservations must be made when required, and tickets are not transferable. If you do not board your train as booked, your entire reservation is subject to cancellation. In order to ensure the quality of travel and safety and security of its passengers, Amtrak may refuse to carry passengers:

- Who have not paid the applicable fare;
- Who present an Amtrak ticket purchased from an unauthorized third party. Amtrak tickets may only be sold or issued by Amtrak or an authorized travel agent/tour operator. Any ticket purchased from an unauthorized third party will be voided. The ticket holder will not be eligible for travel or for a refund.
- Whose conduct is objectionable (such as, but not limited to, being under the influence of alcohol or narcotics);
- Whose personal hygiene makes them offensive;
- Who pose a health, safety or security hazard to other passengers or employees;
- Who refuse to comply with safety or security rules or with instructions of Amtrak personnel;
- Who is traveling with an animal that is not compliant with Amtrak policies (for example, the animal is not under control, acts violently, causes a significant disturbance, or is not housebroken);
- Who would require Amtrak personnel to provide personal care services or otherwise do not meet the essential requirements for the receipt of Amtrak services; or
- Who refuse to consent to Amtrak security inspections of persons and/or baggage onboard Amtrak trains and/or at designated areas, such as train platforms and passenger boarding or waiting areas.

Amtrak employees or other authorized carrier representatives may remove such a passenger from the train at any inhabited place, as necessary under the circumstances, for any of the above reasons.

## Seating

Amtrak will monitor seating of passengers to ensure compliance with the following policies:

- Amtrak reserves to itself full control and discretion as to seating of passengers.
- Amtrak reserves the right, whenever operating conditions require, to transfer passengers from one car or train to another en route.
- Each passenger paying a fare will be entitled to a seat, to the extent coach seats are available.
- Passengers are entitled to one seat per fare, to ensure other paying passengers are not excluded.
- Unless spec  Accessibility  assigned, seating is on a first-come, first-served basis.
- Seat availability is not guaranteed until we provide you with a reservation confirmation.

- On unserved trains there are no guaranteed seats.
- Seating arrangements will be made without regard to race, color, gender, creed or national origin.

Seating is limited. Seats may not be available on all trains at all times.

## Passenger Types

### Adults/Seniors

Amtrak classifies passengers 16 years of age and older as adults for the purpose of pricing tickets.

Passengers 65 years of age and over are eligible to receive a senior discount on most rail fares on most Amtrak trains (60 years of age and older on cross-border services operated jointly by Amtrak and VIA Rail Canada).

### Youth

Youth 13, 14 and 15 years old must travel with an adult passenger who is at least 18 years old. Youth passengers are priced as adults.

### Children/Infants

Children under 2

- Children under 2 years of age traveling free will not be entitled to a seat.
- If a child under 2 does occupy a seat, the conductor has the right to request the child be removed for a fare-paying passenger.
- Nothing in this rule is intended to prevent a child under 2 from occupying a vacant seat aboard a train until it is needed for a paying passenger.

Children 12 years of age and younger must travel with an adult passenger who is at least 18 years old. Exception: A minor who is 16 or 17, who is a parent to children of any age, may bring those children without restriction. The 16- or 17-year-old must bring proof that he or she is the parent of the children.

### Unaccompanied Minor Travel

Youth passengers 13, 14 and 15 may travel alone in accordance to the Unaccompanied Minors policy. Children 12 years of age and younger may not travel unaccompanied.

- Reservations for youth passengers 13, 14 and 15 traveling alone can only be made by speaking with a customer service representative by calling 800-USA-RAIL or at a station with a ticket office.
- Travel is permitted only on Amtrak trains. Travel is not permitted on Thruway motorcoach service, or on any other connecting services.

- Both boarding and arrival stations must be staffed. (Please note that even certain staffed stations do not allow for unaccompanied minors.)
- All travel must take place on the same day with the scheduled departure time no earlier than 5:30 am and the scheduled arrival time no later than 9:30 pm. Overnight travel is not allowed.
- No transfers of any kind are permitted.
- All travel must be within the United States. Unaccompanied minors may not cross the U.S.-Canadian border.
- For each unaccompanied minor traveling alone, the adult (at least 18 years old) bringing the child to the departure station must complete and sign a release form. Both the adult and the minor must be at the boarding station at least 30 minutes before the train's departure time.
- The child must be interviewed by station personnel to determine if the child is capable of traveling alone.
- The child must wear an Amtrak issued wristband for the duration of travel. The adult must remain at the station until the train has departed.
- At the arrival station, the adult picking up the child must check-in with station personnel prior to the train's expected arrival time. The adult must display valid current identification meeting the Amtrak ID policies.
- Children traveling alone are not entitled to a children's discount; full adult fares are charged, and no additional discounts are permitted.
- Because there are not at least two staffed stations along several routes, unaccompanied minors may not travel between any stations on the Downeaster (Boston, MA - Portland, ME), Heartland Flyer (Oklahoma City, OK - Fort Worth, TX) and Pere Marquette (Chicago, IL - Grand Rapids, MI).

If a group of children are traveling, and some are 16-17, some are 13-15, and some are under 13:

- The 16-17 year old minors may travel without restriction.
- The 13-15 year old minors must travel as unaccompanied minors because no one is 18 or over. The Unaccompanied Minor Policy applies.
- The children under 13 may not travel because no one is 18 or over. The Unaccompanied Minor Policy applies.

### Take Precautions for Allergies

Because Amtrak is unable to guarantee a peanut-free or allergen-free trip, we strongly encourage unaccompanied minor passengers to take all necessary medical precautions to prepare for the possibility of exposure. Parents/guardians must ensure that the unaccompanied minor travel with all necessary medications for food allergies (including epinephrine auto-injectors) and is properly trained to self-administer these medications.

### Passenger Identification

Passengers 18 years of age and older must produce valid photo identification when:

- Exchanging, refunding or reprinting Amtrak travel documents
- Purchasing tickets from conductors onboard trains
- Purchasing documents with a stored eVoucher or Transportation Credit
- Traveling as a Pass Rider (active or retired)
- Storing baggage at stations
- Checking baggage (including firearms)
- Sending Amtrak Express shipments
- Asked onboard trains by train crew members, other Amtrak or operating railroad employees
- Asked any time by Amtrak police or any law enforcement officer
- Traveling into Canada
- Guardian purchasing an unaccompanied minor travel document or signing the release form

### What is a Valid ID?

To be valid, your identification must be current and in-force. The following forms of identification are acceptable for persons 18 and older:

- One piece of photo identification issued by a government authority, or
- Two pieces of identification, at least one of which is issued by a government authority,

- Two pieces of identification, at least one of which is issued by a government authority

Examples of acceptable forms of ID include:

- State or provincial driver's license
- Passport
- Official government-issued identification (federal, state, city or county government or foreign government)
- Canadian provincial health card ID card with photo
- Military photo ID
- Student identification (university, college or high school photo ID)
- Job Corps photo ID

### Random Ticket/ID Checks

Following federal Transportation Security Administration (TSA) guidelines, we regularly conduct random ticket verification checks onboard trains to ensure that passengers are properly ticketed. Please be prepared to show valid photo identification to a member of the onboard crew upon request.

## Pets and Animals

### Pets

Small dogs and cats are permitted to travel as pets on most trains.

- Pet reservations are required (and a fee applied) and are available on a first-come, first-served basis.
- Ticketed dogs and cats up to 20 pounds are welcome in Coach class only.
- Pets must remain entirely inside a closed, approved hard or soft sided, leak-proof carrier (19 x 14 x 10.5 inches) while in stations and onboard trains (placed under your seat) and may not travel in food service cars, Business class, First class and bedroom accommodations.
- Pet carriers count as one piece of carry-on baggage.
- Pet must be at least eight weeks old and be odorless, harmless, not disruptive and require no attention during travel.
- Amtrak does not ship pets or allow them to travel as checked baggage; pets must travel with a human.
- Travel with pets on Acela is only allowed on weekends and holidays.
- Travel with pets is not available on Auto Train, Keystone Service, Pennsylvanian, San Joaquins, Capitol Corridor, Pacific Surfliner or Thruway Connecting Services.
- Travel with pets in Canada not available on Adirondack, Maple Leaf and Amtrak Cascades.
- Amtrak maintains the right to refuse acceptance and may remove any disruptive or offensive pet from stations or trains.

- You certify that your pet is up to date on all vaccinations and accept liability for your pet by signing a Pet Release and Indemnification Agreement for each travel segment. Amtrak does not accept liability for the health and well-being of pets.

### Service Animals

Service animals are animals that are trained to perform a specific task for the benefit of a person with a disability and are permitted in all areas where passengers are allowed. Amtrak personnel may ask what task(s) the service animal performs. Carry-on pet guidelines are for animals for which no claim of service is made, and do not pertain to passengers traveling with service animals.

We allow trained service animals accompanying passengers with disabilities in all customer areas in our stations, trains and Amtrak Thruway buses. Trained service animals must be kept under the control of their owners or trainers at all times.

### Pets and Animals Not Considered Service Animals

The following types of animals are considered pets (not service animals) and are welcome on Amtrak if they fit into our carry-on pet guidelines:

- Comfort Animals: Animals not trained to perform a specific task, but which are said to provide emotional support or to relieve anxiety simply by their presence (for example, by the passenger holding or stroking the animal).
- Search and Rescue Dogs: Animals that are trained generally, but not to assist a particular passenger.
- Police Dogs: Other than dogs brought on trains by the Amtrak Police Department.

### Control of Your Service Animal

You must keep your service animal under control at all times. The animal should always be on a leash, harness or other tether, unless this is not possible due to a disability or if the leash or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control.

Amtrak personnel may require you to remove your service animal en route or from the station premises if:

- The animal is out of control and you do not take effective action to control it (for example, a dog causes a significant disturbance by barking repeatedly and uncontrollably or is not housebroken) or
- The animal poses a direct threat to the health or safety of others.

If you are asked to remove your service animal, but you would like to remain on the premises and/or continue travel without the animal, you must make arrangements for another person or local animal control to accept custody of your animal, and you may be required to continue or begin your Amtrak travel at a later time or on a later date.

### Service Animal Must Remain on Floor

A service animal must sit under the passenger's seat or at his or her feet. Service animals are not allowed to sit in the aisle, on seats or beds.

### Walking Your Service Animal

If the train schedule permits, you may walk your service animal at station stops provided that you stay within reasonable proximity to the train and re-board promptly when the conductor notifies you that the train is about to depart. If you plan to walk your animal during the trip, please notify the conductor when you first board the train. Some routes may have limited or no stops for the duration of your trip, so we encourage you to check schedules before you make your travel plans.

Amtrak employees are not responsible for the care or supervision of any passenger's service animal.

## Smoking Policy

All Amtrak trains, Thruway buses and stations are entirely non-smoking. No one may smoke anything in any area on trains, on Thruway services, in stations or in any

other location where smoking is prohibited. This includes:

- Electronic smoking devices, such as electronic cigarettes.
- **Marijuana.** The use or transportation of marijuana for any purpose is prohibited, even in states where recreational use is legal or permitted medically.

## Smoking Stops May Be Available

If time and conditions permit, passengers may smoke on station platforms at longer stops only as announced by train crews. Smoking elsewhere and at other times is not permitted

- Passengers must remain next to the train, ready to re-board immediately upon hearing the sound of the locomotive horn and the all aboard calls from Amtrak employees.
- Smoking stops may be shortened or eliminated entirely if the train is operating late.
- State or local laws may prohibit smoking on station platforms.

# Accessible Travel Services

## Wheeled Mobility Devices

### Boarding and Detraining

Amtrak will provide assistance to passengers with a disability who use a wheeled mobility device in the following situations:

- **High platforms**: Amtrak will assist you across the gap between the platform and the train by using a bridge plate.
- **Low-level platforms**: Amtrak will provide access to the train through the use of station-based mobile lifts.
- **Bi-level trains**: Amtrak will provide a ramp or station-based mobile lift to provide access to the lower level of the train.
- Passengers with mobility impairments who have requested wheelchair lift assistance or passengers who need assistance boarding will be pre-boarded at originating stations and given priority boarding at en route stations.

### Remaining in Your Wheeled Mobility Device or Transferring to a Seat

Accessible spaces and seats are available on Coach, Business class and First-class cars. When booking on Amtrak.com, there are two seating options for passengers who travel with wheeled mobility devices.

- If you use a wheeled mobility device that is not identified as collapsible, you will be offered a wheelchair space and you must remain seated in your device en route to your destination. Amtrak recommends that your brakes be applied when the train is in motion.

- If you travel with a collapsible wheelchair, you will be offered an accessible seat and you must transfer to that accessible seat and stow your wheelchair nearby. Onboard Amtrak personnel will assist you with stowing the device if requested.

If you would like to request alternate accommodations (for example, if your wheeled mobility device is not collapsible, and you prefer to transfer to a seat rather than remain in your device), please call us at 1-800-USA-RAIL or TTY 1-800-523-6590.

### Wheeled Mobility Device Specifications

Amtrak trains accommodate most wheeled mobility devices in use today.

- **Dimensions**: The device should not exceed 30 inches (76 centimeters) wide and 48 inches (122 centimeters) long and should have a minimum of 2 inches (5 centimeters) of ground clearance.
- **Weight**: The combined weight of the wheeled mobility device plus the occupant must be under 600 lbs. (273 kg).
- **Manual and battery powered**: Amtrak permits both manually operated and battery powered wheeled mobility devices that meet these specifications.

## Service Animals

Service animals are animals that are trained to perform a specific task for the benefit of a person with a disability and are permitted in all areas where passengers are allowed.

See details about traveling with service animals.

## Oxygen

Amtrak allows passengers who use oxygen equipment (e.g., bottled oxygen, oxygen concentrators) to bring the equipment onboard Amtrak trains with certain restrictions. Oxygen equipment transport is allowed on trains only for passengers with a disability.

### Making Reservations with Oxygen Equipment

Because it is not possible to make reservations that include oxygen equipment on Amtrak.com or in the mobile application, call 1-800-USA-RAIL or TTY 1-800-523-6590 to let us know of your need to bring oxygen equipment and to make your reservations in advance.

### Oxygen Equipment Requirements

Portable oxygen equipment must meet the following specifications:

- Power Source: Oxygen equipment, including oxygen concentrators, must be able to operate a minimum of four hours without available onboard electrical power (in the event of a power disruption onboard).
- UL or FM Listed: Oxygen equipment must be Underwriter's Laboratory (UL) or Factory Mutual (FM) listed.
- Weight Limits: The total weight of all tanks may not exceed 120 lbs. (54 kg). Within this limit, we allow:
  - No more than 2 tanks, 50 lbs. (22.7 kg) each, or
  - No more than 6 tanks, 20 lbs. (9 kg) each.

## Companions and Attendants

Amtrak does not require that a companion or attendant accompany a passenger with a disability. However, if a passenger anticipates that he or she may need personal care assistance during the trip, such as assistance with feeding, bathing, dressing, medicating or toileting, the passenger must travel with an attendant who can provide such assistance.

The Amtrak train crows are not required or permitted to provide personal care assistance to passengers. Please take this into account when making your travel plans. If

The Amtrak train crews are not required or permitted to provide personal care assistance to passengers. Please take this into account when making your travel plans. If it becomes apparent during a trip that an unaccompanied passenger requires such assistance, the passenger may have to detrain prior to his or her final destination.

Those designated as companions must be 18 years of age or older.

## Amtrak Wallet

If you choose to save a payment card to your profile, you authorize us to use your stored credential information solely for the purpose of completing transactions that you request and servicing those transactions (such as completing a refund request or responding to an inquiry from the issuer of your card). In addition, we may use your stored credential information as provided in our privacy policy. If there are any changes to the use of your stored information we will ask you to re-accept the Amtrak terms and conditions when you sign in to your profile. This consent will remain in effect until all travel associated with purchase transactions conducted with your stored credential has been completed and the time period for any dispute, chargeback, or credit requested has expired.

## Local Transportation

Information regarding local transportation services at Amtrak service locations (including bus, taxi, trolley and other local transportation services) that is posted on Amtrak.com is included solely as a convenience for those using this web site. Amtrak makes no representations that such information is without errors or omissions. Users of Amtrak.com should contact local service providers directly for up-to-date schedule, fare and other information relating to such providers. Unless otherwise stated, Amtrak is not affiliated with any local service providers.

## Force Majeure Event

Amtrak may, in the event of a force majeure event, without notice, cancel, terminate, divert, postpone or delay any train or the right of carriage without liability except to issue a refund. The refund will be made in the original form of payment in accordance with refund rules for any unused portion of the ticket.

Force Majeure Event means:

- Any condition beyond Amtrak's control including, but without limitation, meteorological conditions, acts of nature, riots, civil commotion, embargoes, wars, hostilities, or disturbances - actual, threatened, or reported. Also, because of any delay, demand, circumstances or requirement due, directly or indirectly to such conditions, or
- Any strike, work stoppage, slowdown, lockout or any other labor related dispute involving or affecting Amtrak's services, or
- Any government regulation, demand or requirement, or
- Any shortage of labor, fuel or facilities of Amtrak or others, or
- Any fact not reasonably foreseen, anticipated or predicted by Amtrak.

## Disclaimer of Liability

Amtrak's fares, time schedules, equipment, routing, services and information (hereinafter "Amtrak services") are not guaranteed and are provided "as is" without any warranties of any kind, either express or implied, and Amtrak disclaims all warranties, express or implied.

Amtrak reserves the right to change its policies without notice.

Amtrak further specifically disclaims liability for any inconvenience, expense, or damages, incidental, consequential, punitive, lost profits, loss business or otherwise, resulting from errors in its timetable, shortages of equipment, or due to delayed trains, except when such delay causes a passenger to miss an Amtrak train guaranteed connection. When a guaranteed Amtrak train connection is missed, Amtrak will provide passenger with alternate transportation on Amtrak, another carrier, or provide overnight hotel accommodations, at Amtrak's sole discretion, but only when such circumstances resulted from the actions of Amtrak and this shall constitute Amtrak's sole liability and passenger's sole and exclusive remedy.

Amtrak also disclaims any liability for the products and/or services of Amtrak's advertisers, business partners, sponsors, suppliers, licensors and agents to the extent permissible under the law and Amtrak shall only be responsible for the rail transportation services that it provides.

## Alexa Skills App

**End User License Agreement for Amtrak's Alexa Skills App**

This End User License Agreement ("EULA") is between you and the National Railroad Passenger Corporation ("Amtrak") for your use of our Skills app, as it may be updated from time to time (the "Amtrak Skill") on the Alexa platform provided by Amazon Services LLC and/or its affiliates ("Amazon").

Amtrak may add features and functionality to the Amtrak Skill at any time, with or without notice. Some features, such as ticket purchases, are subject to Amtrak's Terms and Conditions found at www.amtrak.com. Features pertaining to our Guest Rewards program may require you to link the Amtrak Skill to your Guest Rewards account.

Limited license: Amtrak is licensor of the Amtrak Skill. Amtrak grants you a limited, nontransferable license to download and use the Amtrak Skill, only on Amazon's Alexa platform and only for your personal and noncommercial purposes. Amtrak may terminate such license at any time, in Amtrak's sole discretion, with or without notice.

Privacy: Any information that we collect from you is governed by our privacy policy, and will not be subject to the Amazon.com Privacy Notice.

AMTRAK DISCLAIMS ANY AND ALL RESPONSIBILITY OR LIABILITY FOR THE ACCURACY, CONTENT, COMPLETENESS, RELIABILITY, USEFULNESS, OR AVAILABILITY OF INFORMATION OR MATERIAL PROVIDED, DISPLAYED IN, OR ACCESSIBLE THROUGH THE AMTRAK SKILL.

THE AMTRAK SKILL AND ALL INFORMATION, PRODUCTS, AND SERVICES PROVIDED BY THE AMTRAK SKILL ARE PROVIDED "AS IS" AND "AS AVAILABLE" WITH NO WARRANTIES WHATSOEVER. AMTRAK EXPRESSLY DISCLAIMS TO THE FULLEST EXTENT PERMITTED BY LAW ALL EXPRESS, IMPLIED, AND STATUTORY WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT OF PROPRIETARY RIGHTS. AMTRAK ALSO DISCLAIMS ANY WARRANTIES REGARDING THE SECURITY, RELIABILITY, TIMELINESS, AND PERFORMANCE OF THE AMTRAK SKILL.

YOU ARE RESPONSIBLE FOR THE SAFE AND APPROPRIATE USE OF THE AMTRAK SKILL ON THE AMAZON ALEXA PLATFORM. AMTRAK SHALL NOT BE RESPONSIBLE FOR ANY PERSONAL INJURY OR DAMAGE TO PROPERTY THAT MAY OCCUR IN CONNECTION WITH OR AS A RESULT OF THE USE OF THE

AMAZON ALEXA PLATFORM AND ANY CONNECTED DEVICES, AND YOU EXPRESSLY WAIVE ALL RIGHTS AGAINST AMTRAK WITH RESPECT THERETO.

Other terms:

1. You may not modify, reverse engineer, decompile or disassemble the Amtrak Skill in whole or in part, or create any derivative works from or sublicense any rights in the Amtrak Skill, unless otherwise expressly authorized in writing by Amtrak.
2. The Amtrak Skill is protected by copyright and other intellectual property laws and treaties. Amtrak or its licensors own all title, copyright and other intellectual property rights in the Amtrak Skill. For clarity, the Amtrak Skill is licensed, not sold.
3. You acknowledge and agree that Amazon has no responsibility or liability with respect to your use of the Amtrak Skill or any content or functionality in the Amtrak Skill.

Limitation of Liability: TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL AMTRAK, ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS AND/OR CONTRACTORS BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, DAMAGES FOR LOSS OF PROFITS, USE, DATA OR OTHER INTANGIBLES, EVEN IF AMTRAK HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, THAT RESULT FROM THE USE OR THE INABILITY TO USE THE AMTRAK SKILL, FROM ANY CHANGES TO THE AMTRAK SKILL, OR FROM UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA. IF YOU ARE DISSATISFIED WITH THE AMTRAK SKILL OR THE INFORMATION AND MATERIALS AVAILABLE ON OR THROUGH THE AMTRAK SKILL, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE AMTRAK SKILL.

Indemnity: You agree to hold harmless and indemnify Amtrak and its officers, directors, employees, contractors and agents harmless from and against any third-party claim arising from your use of the Amtrak Skill, including liability, damages or costs (including litigations costs and attorneys' fees).

Disputes: Any controversy or claim arising out of or relating to the Amtrak Skill shall be settled by binding arbitration in Washington, DC, or at such other location as may be mutually agreed upon by the parties, in accordance with the procedural rules for commercial disputes set forth in the Comprehensive Arbitration Rules and Procedures of JAMS ("JAMS Rules and Procedures") then prevailing, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitrator shall be selected pursuant to the JAMS Rules and Procedures. The arbitrator shall apply Washington DC law consistent with the Federal Arbitration Act and applicable statutes of limitations, and shall honor claims of privilege recognized at law. In the event that you are able to demonstrate that the costs of arbitration will be prohibitive as compared to the costs of litigation, Amtrak will pay as much of the claimant's filing and hearing fees in connection with the arbitration as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. If any part of this arbitration provision is deemed to be invalid, unenforceable or illegal (other than that claims will not be arbitrated on a class or representative basis), or otherwise conflicts with the rules and procedures established by JAMS, then the balance of this arbitration provision shall remain in effect and shall be construed in accordance with its terms as if the invalid, unenforceable, illegal or conflicting provision were not contained herein. If, however, the portion that is deemed invalid, unenforceable or illegal is that claims will not be arbitrated on a class or representative basis, then the entirety of this arbitration provision shall be null and void, and neither you nor Amtrak shall be entitled to arbitrate their dispute. Upon filing a demand for arbitration, all parties to such arbitration shall have the right of discovery, which discovery shall be completed within sixty days after the demand for arbitration is made, unless further extended by mutual agreement of the parties. The arbitration of disputes pursuant to this paragraph shall be in your individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. The arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated. Do not use this Skills App if you do not agree to have any claim or controversy arbitrated in accordance with this

EULA.  By using the Amtrak Skill, you agree that to the extent permitted by applicable law: (1) any and all disputes, claims and causes of action arising out of or connected with the Amtrak Skill will be resolved individually through binding arbitration as set forth above, without resort to any form of class action; (2) any and all claims, judgments and awards will be limited to actual third-party, out-of-pocket costs incurred (if any), but in no event will attorneys' fees be awarded or recoverable; (3) under no circumstances will you be permitted to obtain any award for, and you hereby knowingly and expressly waive all rights to seek, punitive, incidental, consequential or special damages, lost profits and/or any other damages, (other than actual out of pocket expenses), and/or any rights to have damages multiplied or otherwise increased; and (4) your remedies are limited to a claim for money damages (if any) and you irrevocably waive any right to seek injunctive or equitable relief. Some jurisdictions do not allow the limitations or exclusion of liability, so the above may not apply to every user.

## Arbitration Agreement

### Arbitration Agreement

Mutual Agreement to Arbitrate ("Arbitration Agreement"). This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration. Amtrak and Customer (on behalf of yourself and any individuals for whom you purchase tickets, including, without limitation, family members, minor passengers, colleagues and companions (collectively "You" or "Your"), AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad, based upon or related to: these Terms and Conditions, breach of contract, tort claims, common law claims, Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, any personal injuries (including, but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary or punitive damages arising out of or related to any personal injury), and any claims for discrimination and failure to accommodate, which shall be decided by a single arbitrator through binding arbitration and not by a judge or jury. Except with respect to the Class Action Waiver below, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability, enforceability, unconscionability or waiver of this Arbitration Agreement, including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable. This Arbitration Agreement is governed by the Federal Arbitration Act ("FAA") and evidences a transaction involving commerce. The arbitration will be conducted before a single arbitrator under the Consumer Arbitration Rules of the American Arbitration Association ("AAA"), which are available at the AAA website (www.adr.org). A court of competent jurisdiction shall have the authority to enter judgment upon the arbitrator's decision/award. The parties agree to bring any claim or dispute in arbitration on an individual basis only, and not as a class or representative action, and there will be no right or authority for any claim or dispute to be brought, heard or arbitrated as a class or representative action ("Class Action Waiver"). Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules, any dispute relating to the interpretation, applicability, enforceability or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator. This Arbitration Agreement does not apply to any claim or dispute that an applicable federal statute states cannot be arbitrated.

### Our Commitment to Customers

We want to make sure you have the best experience with Amtrak possible. If we disappoint you, we want to make things right — as quickly as possible.

**We successfully resolve over 95% of customer complaints directly with our customers.**

Our success rate is so high because we take accountability for our actions. When you experience injury, harm or loss on one of our trains, we work directly with you to ensure you get the support and restitution you need. We do everything possible to satisfy you because we want the opportunity to earn your business again.

**We support our customers' right to seek outside legal help as a last resort.**

In rare cases, Amtrak cannot reach a resolution with a customer that feels fair to both sides. In these instances, Amtrak recognizes that our customers may want to pursue a remedy through legal channels. We understand and agree that you have the right to have your legal dispute decided by a neutral trier of fact.

**We believe arbitration is the fastest and best way for our customers to resolve legal disputes.**

Arbitration is typically quicker and more efficient than the court systems, which are overburdened. Both Congress and the U.S. Supreme Court have found that arbitration is a more efficient way of resolving legal disputes than going to court.

## Your Legal Rights - Protected Through Arbitration

When you buy a ticket to ride Amtrak, you agree to resolve any legal dispute you have with Amtrak through arbitration instead of going to court. Our Mutual Agreement to Arbitrate is detailed in these Terms and Conditions.

**Arbitration offers key legal protections available in civil courts –** including an arbitration venue of your choice, legal representation, an independent decision-maker, and the ability to recover damages and all other relief available to an individual under applicable laws.

## Benefits

**Arbitration offers benefits over civil court.**

Litigation is costly and disruptive. We believe that arbitration is a fair way for both Amtrak and you to resolve covered disputes.  In many instances, we believe that arbitration can be a more economical and quicker way to resolve disputes.  Many companies use arbitration agreements, and arbitration is also very common between businesses and consumers. The United States Supreme Court has consistently allowed for arbitration, and the federal law governing arbitration, the Federal Arbitration Act, has been around since 1925.

## Myths & Misunderstandings

We want to clear up some myths and misunderstandings about the arbitration process:

**Arbitration does not impose a "gag rule."**

You are free to discuss your claim with law enforcement authorities, the public, other consumers, and anyone else you deem appropriate.

**Arbitration is not controlled by Amtrak.**

A neutral professional arbitrator, mutually selected by the parties, makes all pertinent decisions about the case.Arbitrators are provided by the American Arbitration Association, a non-profit organization and a recognized national leader in this field. Many of these arbitrators are experienced lawyers and former judges, and they are required to adhere to ethical rules.

**Arbitration is not stacked against claimants.**

The arbitrator is neutral and selected by the parties.

# Amtrak Guest Rewards Program Terms & Conditions

## A. General Membership Guidelines

1. Membership is open to all residents of the U.S. and Canada. To become a member ("Member") of the Amtrak Guest Rewards Program (the "Program"), individuals must enroll by visiting Amtrak.com (the "Site") and completing an enrollment form, or by calling 1-800-307-5000. To complete an enrollment, individuals must provide their full name, address, phone number and email address ("Registration Data"). Full name is defined as the given name, middle initial (if any), and surname. You shall be subject to any posted guidelines or rules applicable to these terms and conditions ("T&Cs") posted on this site (subject to routine updates), those obtained by calling 1-800-307-5000, or by writing to Amtrak Guest Rewards, P.O. Box 14368, Philadelphia, PA 19115. Only individuals age 13 and older may enroll via the Internet.
2. Members must provide a valid, unique email address upon enrollment. Members may opt in to receive monthly eStatements and offers by email. Only one Program account may be associated with a single email address.
3. Members have the option of opting in to receive information and offers via text messaging by updating their profile preferences. Only one Program account may be associated with a single mobile phone number. If there are multiple Members in a household who share a mobile phone number, those Members can choose to receive mobile information and offers associated with only one Program account.
4. You agree to (a) provide true, accurate, current and complete Registration Data as prompted by the Program enrollment form, and (b) maintain and promptly update the Registration Data (found in the "My Account" section of the site) to keep it true, accurate, current and complete. If you provide any Registration Data that is untrue, inaccurate, not current or incomplete, or if Amtrak, in its discretion, suspects that your Registration Data is untrue, inaccurate, not current or incomplete, Amtrak has the right to suspend, terminate, or refuse your current or future use of the Program.
5. You agree that creation of a Membership Number, as defined in subsection A6, and/or participation in the Program will represent your acceptance of these T&Cs. Upon our request, you agree to sign a non-electronic version of these T&Cs.
6. Members will be provided with a membership number that identifies the individual Member (a "Membership Number") upon enrollment. The Member should provide the Membership Number when making Amtrak reservations or transacting with Program partners in order to receive points. The Membership Number is unique to each individual Member and is not transferable.

## B. Your Conduct

1. You agree not to impersonate any person or entity using the Program, and not to upload, post, email, or otherwise transmit any material that contains software viruses, or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment used by the Program.
2. You agree not to spam or flood the Site or service, or remove any copyright, trademark, or other proprietary rights notices contained on the Site.
3. You also agree not to use any robot, spider, site search/retrieval application, or other manual or automatic device or process to retrieve, index, "data mine," or in any way reproduce or circumvent the navigational structure or presentation of the Site or service or its contents, or otherwise interfere with, or disrupt, the Program or servers or networks connected to the Site, or violate these T&Cs or any requirements, procedures, policies or regulations of the Program, or of any networks connected to it.
4. You agree not to intentionally or unintentionally violate any applicable local, state, national or international statutes, regulations, regulatory guidelines and judicial or administrative interpretations, or any rules or requirements established by Amtrak (all of which shall constitute "Applicable Law") in connection with your use of the Program.

## C. Rules for Earning Amtrak Guest Rewards Points

1. Only one Program account will be allowed per individual. In the event that more than one account number is assigned to the same Member (duplicate accounts),

1. Only one Program account will be allowed per individual. In the event that more than one account number is assigned to the same Member (duplicate accounts), only the applicable point credit, excluding any enrollment bonus in the duplicate account, can be transferred to the original account. Duplicate accounts and/or points earned or purchased not in accordance with Program Terms and Conditions will be canceled upon notification from the Member or at Amtrak's discretion.

2. From time to time, potential Members may be offered the opportunity to earn bonus points for enrollment. This bonus may be based on enrollment method or on a source enrollment promotion code that must be provided during the enrollment process. Only one enrollment bonus will be allowed per individual Member.

3. A Member may receive points only for his/her own travel, and will not receive points for trips purchased by the Member, but not traveled personally by the Member. Points can be accumulated only once for each trip, regardless of the number of seats purchased. Accrued points and reward trips and coupons have no monetary value and do not constitute property of the Member.

4. Points will not be awarded for travel on tickets issued as reward travel from Amtrak or on travel purchased through auction/discount portals such as eBay. Points will not be awarded for tickets purchased with an Amtrak Transportation Voucher. If a ticket is partially paid for with a Transportation Voucher, then the portion funded by the Transportation Voucher will not earn points; however, the remaining value of the ticket purchased will earn points.

5. Except as provided in this Section, Members who provide their Membership Number at the time of ticket purchase will earn 2 points for every $1 spent on Amtrak travel. Members will earn an additional 25% point bonus for qualifying Business class travel and an additional 50% point bonus for qualifying Acela First class travel. If a free One-Class Upgrade coupon is applied to a reservation, Member will be eligible for the point bonus associated with the original class of service, not the upgraded service. To receive points for Amtrak travel, the Member must provide his/her Membership Number at the time of making reservations and the passenger name must match the Member name. For travel on Amtrak that occurs prior to a Member's enrollment date, points will be awarded, upon request, only for travel that occurs within 21 days prior to the Member's enrollment date. Members may earn points for one train ticket used on a single train or individual train number on a single day. Additional tickets for the same train or individual train number, on the same day, will not earn points.

6. To resolve point discrepancies, Members must contact the Amtrak Guest Rewards Service Center in writing within 60 days following the transaction in question by mail or using the contact us form. Members must provide Amtrak with sufficient written documentation of the transactions in question. Written requests must also include the Member's name, Membership Number, address, and daytime telephone number. Submit written requests to: Amtrak Guest Rewards, P.O. Box 14368, Philadelphia, PA 19115. In the case of a dispute regarding points, Amtrak's decision will be final.

7. Points will be credited to a Member's account within 3 weeks after the completion of the Member's Amtrak trip. Points for 8000-series Thruway service travel may take up to 90 days to be credited. Members should retain their Amtrak ticket stubs or reservation confirmation until the points for their travel appear in their Program accounts.

8. If the Membership Number was not included when the Member made the reservation, retroactive credit may be requested within 120 days of travel. The Member may request retroactive credit online using the Missing Points Request Form. The Member may also request retroactive credit by contacting the Amtrak Guest Rewards Service Center by mail at the addresses in Section C.6 or using the "contact us" form. Points will not be awarded for travel on Amtrak made without a Membership Number using unreserved tickets unless the unreserved ticket has the Member's name on the eTicket or ticket stub. If a Member purchases a ticket for Amtrak travel on board an Amtrak train, the Member may request retroactive credit by contacting the Amtrak Guest Rewards Service Center by mail at the addresses in Section C.6 or by using the contact us form.

9. Members may have the opportunity to earn points by purchasing products or services from Program partners. Program partners, partner offers and partner locations are subject to change without notice, and Amtrak assumes no responsibility for partner changes or for informing Members of changes. Points earned through transactions with Program partners will typically be awarded within 6 weeks.

10. Additional Exclusions. To earn points for Amtrak travel, the Member must travel on Amtrak using an Amtrak ticket. Members will not earn points for travel on Amtrak using a ticket issued by a carrier other than Amtrak. Members will not earn points for a step-up ticket paid to Amtrak from other carriers for use on an Amtrak train. Neither the originating carrier's pass nor the step-up amount paid to Amtrak is eligible to earn points. Members will not earn points for tickets purchased with discounted group fares. Members will not earn for Amtrak 7000-series Thruway services or the Canadian portion of joint Amtrak/VIA Rail Canada services.

## D. Point Expiration

1. Subject to these Program Terms and Conditions, points earned under the Program will not expire as long as the Program continues and the Member's Program account is active.  "Active" means that the Member earns and/or redeems Program points using his or her Membership Number within a 24-month period.

2. If no Member-initiated qualifying activity is recorded or reported within 24 months, your points will expire. You can view all point and travel activity in the "My Transactions" section of My Account on this site.

## E. Claiming Rewards

1. Members may redeem points for Amtrak travel rewards at Amtrak.com or by calling the Amtrak Guest Rewards Service Center. To redeem points for travel on Amtrak, a Member must reserve and obtain the ticket prior to the train departure time. Members may not redeem points for Amtrak 7000-series Thruway services or the Canadian portion of joint Amtrak/VIA Rail Canada services.

2. In order to redeem points for items other than Amtrak travel, upgrade coupons or lounge passes, a member's account must show at least one point-earning transaction from a paid Amtrak ticket.

3. Amtrak travel reward trips may be modified or canceled by the Member if applicable based on the fare rules associated with the ticket. Points will not be refunded if the redemption trip is not cancelled prior to the time of departure ("no-show"). All modifications to trips purchased with points are subject to availability and point/monetary penalty. Cancellations of such trips are subject to applicable point penalty. Points cannot be combined with cash for an upgrade in service. If the ticket has been printed (not an eTicket), the unused ticket must be returned to the Amtrak Guest Rewards Service Center at the address set forth in Section C.6 if eligible for refund or exchange. If the ticket has not been printed or is an eTicket, the cancellation may be done by phone with the Amtrak Guest Rewards Service Center or online at Amtrak.com.

4. If a Member needs to exchange tickets due to a disruption in service, Amtrak will book the Member on the next available train at the same level of service if available. If only a lower level of service is available, and the Member agrees to accept that lower level of service, the difference in points will be deposited in the Member's Program account upon request from the Member.

5. Blackout dates may apply to some offers and promotions including One-Class Upgrade coupons and free companion fare coupons. All Amtrak travel rewards are subject to reward seat availability and may not be available on all trains.

6. Member is responsible for maintaining a point balance of zero or greater at all times. Members must have sufficient points posted to their Program accounts to redeem points for the Program Reward of their choice. Points cannot be combined with cash or with another Member's points to obtain a Program Reward. Amtrak reserves the right to limit the quantities of Program Rewards redeemed by a single Member in a given time period.

7. Amtrak is not responsible for any products or services offered by other companies participating in the Program ("Program Merchants"). Program Merchants are solely responsible for the quality and performance of the goods or services supplied. Any rules of the Program Merchants relating to returns and exchanges apply, but no points will be re-credited to a Member's Program account. Use of the Program does not, in any way, indicate that Amtrak recommends or endorses any Program Merchant, regardless of whether the Program Merchant participates in the Program.

8. Amtrak Guest Rewards non-Amtrak travel gift cards will be sent via the U.S. Postal Service, and will typically arrive within 2 weeks. If a non-Amtrak travel digital gift card is selected, it will typically be electronically delivered within 3-7 days. Gift cards are not returnable or refundable and cannot be redeemed for cash and cannot be bartered or sold. Gift cards are governed by the specific rules, conditions, blackout dates and expiration dates shown on or associated with each and are subject to change without notice. Amtrak is not responsible for lost, stolen, damaged, misdirected or misplaced gift cards. Unless otherwise noted in the Program materials, Program Rewards do not include incidental charges such as food, beverages, taxes, service or other charges.

9. Members with Amtrak Guest Rewards Select, Select Plus or Select Executive status may redeem their points with participating point transfer partners. Current Amtrak Guest Rewards Select and Select Plus Members may redeem up to 50,000 Amtrak Guest Rewards points per calendar year with participating point transfer partners. Current Amtrak Guest Rewards Select Executive Members are not subject to point limits when redeeming their points with participating point transfer partners.

10. You must be a member of the partner's program in which you are transferring Amtrak Guest Rewards points to and abide by that program's rules and regulations in

10. You must also convert a minimum of 5,000 points, rather than the minimum of 1,000 points required by the program, to comply with foreign laws and regulations in order to exchange points to their currency.

## F. Amtrak Guest Rewards Conditions

1. Amtrak may, in its discretion, cancel, modify, restrict, or terminate the Program or any aspects or features of the Program at any time without prior notice. Updated Program rules will be available at Amtrak.com. Any change in the Program will apply to unredeemed points as well as points Members may earn in the future.

2. In accumulating points or Program Rewards, Members may not rely upon the continued availability of any Program Reward and Members may not be able to obtain all offered Program Rewards for all destinations or trips. Amtrak and its partners have the right to change, limit, modify, or cancel Program rules, regulations, rewards, and reward levels at any time. That includes, without limitation, increasing the levels or number of points required for a Program Reward, changing Program Rewards, reducing the number of seats available for Program Rewards on Amtrak trains, adding blackout dates, limiting rooms available for a Program Reward at any participating hotel, changing locations served by Amtrak or its partners, changing or canceling the Program Rewards offered by Program Merchants, or changing or canceling partner participation in Amtrak Guest Rewards. Program rules may change due to changes in Program Merchant rewards programs. Redemption of all Program Rewards is subject to availability. In the event that any of these conditions occur, Members may not be able to obtain certain Program Rewards. Amtrak assumes no liability for these changes. Some Amtrak train or bus services, such as special excursions, may be excluded from Program Reward availability at Amtrak's discretion.

3. Earnings of points and redemption of Program Rewards may be subject to income or other taxes. Members are responsible for taxes, if any, due on points or Program Rewards.

4. If, in their sole discretion, Amtrak or its partners suspect fraud, misrepresentation, abuse, or violation of applicable rules involving points or Program Rewards use, Amtrak and its partners have the right to take appropriate administrative and/or legal action, including the cancellation of accumulated points and Program Rewards, and termination of Program participation.

5. If Amtrak and/or any Program partner or Program Merchant improperly denies a Member point credit, Program Rewards, or some other benefit, the Member's exclusive remedy shall be the issuance of the improperly denied credit, Program Reward or benefit, if available, or such other comparable benefit as determined by Amtrak, which shall have no additional liability whatsoever.

6. By participating in the Program, Members agree to receive mailings from Program Merchants. Members may request to be removed from Program partner mailings by contacting the Amtrak Guest Rewards Service Center. You may review our complete Privacy Policy by accessing Amtrak.com, by calling 1-800-307-5000, or by writing to Amtrak Guest Rewards at the address set forth in Section C.6.

7. The Program is subject to all applicable laws and regulations and the redemption of Amtrak rewards is void where prohibited by law. The sale or barter of any Program Reward or other reward offered through the Program, other than by Amtrak, is expressly prohibited.

8. Amtrak reserves the right to make promotional offers selectively available to Members, based on travel activity, geographic location, Program participation, or other factors.

9. Accrued points are not transferable in the event of Member death or divorce. All points are subject to all other Program rules. Once points have expired in accordance with the Program rules, they will not be reinstated.

10. Each Member shall be responsible for advising Amtrak of any changes of name, address, email, or any other profile information.

11. Except as otherwise provided, the Program is only open to individual participants and not corporations or businesses. Pooling of points or using another individual's account is considered fraudulent and may result in the loss of all points.

12. AMTRAK MAKES NO WARRANTIES OR REPRESENTATION EITHER EXPRESSED OR IMPLIED, AND EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY AND DAMAGES (INCLUDING DIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES) WITH RESPECT TO TYPE, QUALITY, OR FITNESS OF GOODS OR SERVICES PROVIDED THROUGH THIS PROGRAM.

13. Amtrak is not responsible for requests or correspondence lost or delayed in the mail. Amtrak also reserves the right to correct errant Program point values represented on statements or the Site. Amtrak reserves the right to adjust Point values at its sole discretion.

14. Each Member is responsible for remaining knowledgeable as to the Program terms and conditions and as to the number of points in his or her account. Neither Amtrak nor Program Merchants will be liable for any of the following: incorrect or inaccurate transcription of entry information; problems related to any of the equipment or programming associated with or utilized by the Member; any human error; any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission; problems relating to computer equipment, software, or inability to access the Site; any other technical or non-technical error or malfunction; lost, late, stolen, illegible, incomplete, garbled, misdirected, mutilated, or postage due mail, or other mail for whatever reason.

15. Notices to Members may be made via either email or regular mail to any address in a Member's account profile or other information that such Member has provided to Amtrak in connection with the Program. Members also may be notified of changes to these T&Cs or other matters on Amtrak.com.

16. All terms and conditions are subject to change. Amtrak reserves the right to alter or cancel the Program at any time.

17. All interpretations of Program terms and conditions shall be at the sole discretion of Amtrak.

18. These T&Cs and the relationship between Members and the Program shall be governed by the laws of the District of Columbia without regard to its conflict of law provisions. Each Member agrees to submit to the personal and exclusive jurisdiction of the federal courts located within the District of Columbia.

19. The failure of Amtrak to exercise or enforce any right or provision of these T&Cs shall not constitute a waiver of such right or provision.

20. Each Member represents that such Member is of sufficient legal age to use the Program and to create binding legal obligations for any liability such Member may incur as a result of such Member's use of the Program.

21. Claims of Copyright Infringement. The Digital Millennium Copyright Act of 1998 (the "DMCA") provides recourse for copyright owners who believe that material appearing on the Internet infringes their rights under U.S. copyright law. If you believe in good faith that materials hosted by Amtrak or one of its subsidiaries infringe your copyright, you (or your agent) may send Amtrak a notice requesting that the material be removed, or access to it blocked. If you believe in good faith that a notice of copyright infringement has been wrongly filed against you, the DMCA permits you to send Amtrak a counter-notice. Notices and counter-notices to Amtrak must meet the then-current statutory requirements imposed by the DMCA. Notices and counter-notices with respect to the Site should be sent to:

Amtrak Law Department
Copyright DMCA Complaint
1 Massachusetts Avenue, NW
Washington, DC 20001

22. We suggest that you consult your legal advisor before filing a notice or counter-notice. Also, please be aware that there can be penalties for false claims under the DMCA.

23. Links to Other Websites. The Site may contain links to other Internet websites or resources. Amtrak neither controls nor endorses such other websites, nor has Amtrak reviewed or approved any content that appears on such other websites. You acknowledge and agree that Amtrak shall not be held responsible for the legality, accuracy, or inappropriate nature of any content, advertising, products, services or information located on or through any other websites, nor for any loss or damages caused or alleged to have been caused by the use of, or reliance on, any such content.

24. Indemnification. You agree to indemnify, defend and hold Amtrak, its officers, directors, employees, agents and representatives harmless from and against any and all claims, damages, losses, costs (including reasonable attorneys' fees), or other expenses that arise directly or indirectly out of or from (a) your breach of this Agreement; (b) any allegation that any materials that you submit to Amtrak or transmit to the Site infringe or otherwise violate the copyright, trademark, trade secret or other intellectual property or other rights of any third party; and/or (c) your activities in connection with the Site or any services related to the Site.

25. Disclaimers. THE SITE, THE MATERIALS ON THE SITE, AND ANY PRODUCT OR SERVICE OBTAINED OR ACCESSED THROUGH THE SITE ARE PROVIDED "AS IS" AND WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, AMTRAK, ITS OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, SUPPLIERS, ADVERTISERS, AND AGENTS DISCLAIM ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF TITLE, NON–INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, AND ALL WARRANTIES RELATING TO THE ADEQUACY, ACCURACY OR COMPLETENESS OF ANY INFORMATION ON THE SITE AS IT RELATES TO THE PROGRAM. Applicable law may not allow the exclusion of implied warranties

so the above exclusions may not apply to you. AMTRAK AND ITS AFFILIATES, SUPPLIERS, AGENTS AND SPONSORS DO NOT WARRANT THAT YOUR USE OF THE SITE WILL BE UNINTERRUPTED, ERROR–FREE, OR SECURE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SITE OR THE SERVER(S) ON WHICH THE SITE IS HOSTED ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. YOU ACKNOWLEDGE THAT YOU ARE RESPONSIBLE FOR OBTAINING AND MAINTAINING ALL TELEPHONE, COMPUTER HARDWARE, AND OTHER EQUIPMENT NEEDED TO ACCESS AND USE THE SITE, AND ALL CHARGES RELATED THERETO. YOU ASSUME TOTAL RESPONSIBILITY AND RISK FOR YOUR USE OF THE SITE AND YOUR RELIANCE THEREON.

26. Aspects of the Amtrak Guest Rewards Program are covered by one or more of the following patents: U.S. Patent No. 5,774,870; U.S. Patent No. 6,009,412; and U.S. Patent No. 6,578,012

## G. Select, Select Plus, Select Executive Membership

1. Select, Select Plus, or Select Executive membership status is an extension of the Amtrak Guest Rewards Program. All terms and conditions for the standard Amtrak Guest Rewards Program apply to Select, Select Plus and Select Executive membership.
2. Select membership is automatically achieved by earning 5,000 Amtrak Guest Rewards Tier Qualifying Points (TQPs) during a calendar year. Select Plus membership is automatically achieved by earning 10,000 Amtrak Guest Rewards TQPs during a calendar year. Select Executive membership is automatically achieved by earning 20,000 Amtrak Guest Rewards TQPs during a calendar year. TQPs are the base points you earn for traveling on Amtrak using your membership number and through special promotions. Amtrak may offer the ability to earn TQPs through non-travel promotions. Each member may earn a maximum of 4,000 TQPs by non-travel means per year.
3. Select, Select Plus and Select Executive benefits and qualification requirements may change from year to year. Select/Select Plus/Select Executive benefits are subject to availability.
4. In order to receive Select/Select Plus/Select Executive benefits, the Select/Select Plus/Select Executive Member is responsible for providing his/her Amtrak Guest Rewards Select/Select Plus/Select Executive membership card or membership number when required.
5. Tier Bonus Points: Select Members will earn an additional 25% on base Amtrak travel points awarded. Select Plus Members will earn an additional 50% on base Amtrak travel points awarded. Select Executive Members will earn an additional 100% on base Amtrak travel points awarded. For example, for every four points earned, one extra point will be awarded for Select, two extra points will be awarded for Select Plus, and four extra points will be awarded for Select Executive. Bonus points apply only to points earned directly through Amtrak travel and will not be awarded on points earned through Program partners, points purchased through Program partner rewards or Amtrak bonus points.
6. Members can belong to only one membership level at any given time; Members cannot be Select, Select Plus and Select Executive, or any combination, at the same time, and can earn either the Select, the Select Plus or the Select Executive point bonus on travel, based on tier qualification, but not multiple bonuses.
7. All partner offers are subject to the partner's own terms and conditions.
8. Amtrak and its partners reserve the right to change, modify or terminate the Select, Select Plus or Select Executive membership tier or any of its benefits at any time, with or without notice.

## H. Buy/Gift Points

1. You may purchase points for yourself or purchase points to give to another Amtrak Guest Rewards Member.  These points are referred to as "Buy/Gift Points." Buy/Gift Points are sold by Points.com.
2. To purchase points, you must have your Amtrak Guest Rewards member number, the recipient's Amtrak Guest Rewards member number (if applicable), and a valid credit card accepted by Points.com.
3. Buy/Gift Points can be purchased in increments of 500 points, and each Member may buy or receive up to a total of 30,000 points in a calendar year. Select Executive Members are not subject to limits on the number of points they may buy or give.
4. Buy/Gift Points will typically be posted to your account or the account of the recipient the same day as purchased, however please allow up to 72 hours for transactions to complete.
5. Buy/Gift Points do not count toward Select, Select Plus or Select Executive status for the purchaser or the recipient.
6. Buy/Gift Points purchases are sold in U.S. Dollars. In the event that payment for Buy/Gift Points is not received, Amtrak reserves the right to cancel such points.
7. Payments for Buy/Gift Points are not refundable and not exchangeable.
8. The purchase of points and gifts of points are final.
9. Any points transferred through this agreement may not be conveyed to persons engaged in the sale, direct or indirect of points or arranging for the sale of such points.
10. Purchases from Points.com may be subject to additional terms and conditions between you as the purchaser and Points.com.  Such terms and conditions, if any, will be displayed on the Points.com website at the time of purchase. Amtrak is not a party to any such terms and conditions.

## I. Share Points

1. You may transfer points from your account to the account of another Amtrak Guest Rewards Member.  These points are referred to as "Share Points".
2. To share points, you must have your Amtrak Guest Rewards member number and the recipient's Amtrak Guest Rewards member number.
3. Points can be shared in increments of 1,000 points. You may not share more than 100,000 points total in a calendar year. Select Executive Members are not subject to limits on the number of points they may share.
4. Share Points are typically posted to the recipient's Amtrak Guest Rewards account the same day, however please allow up to 72 hours for points to appear in the recipient's account.
5. Share Points do not count toward Select, Select Plus or Select Executive status for the recipient.
6. You will be charged $0.01 USD per point transferred. GST/HST and/or other applicable taxes apply to residents in Canada. Amtrak retains the right to transfer points back to the original account if the payment is not received.
7. Payments for Share Points are not refundable and not exchangeable.
8. All Share Points transactions are final. Once a transaction is complete and payment is received, the points will not be re-deposited to the original account under any circumstance.
9. Any points transferred through this agreement may not be conveyed to persons engaged in the sale, direct or indirect of points or arranging for the sale of such points.



©2020 National Railroad Passenger Corporation
https://www.amtrak.com/content/amtrak/en-us/terms-and-conditions

Need Help?

DECLARATION OF NANDAN M. JOSHI

EXHIBIT 5



# FY 2018 Company Profile
### For the Period October 1, 2017 - September 30, 2018



*Customers board a Northeast Regional train at Boston South Station*

## Table of contents

Fiscal Year 2018 Highlights ................ 1

Corporate Background ........................ 2

Network, Financial Performance,
Infrastructure Assets ............................3

Northeast Corridor Services ............. 4

State Supported Services ................... 5

Long Distance Services ....................... 7

Contract Commuter Services ........... 7

Equipment and Trains.......................... 8

## Did you know?

The name "Amtrak" results from the blending of the words "America" and "track." It is properly used in documents with only the first letter capitalized. The railroad is officially known as the National Railroad Passenger Corporation.

## Fiscal Year 2018 Highlights

- Amtrak posted record GAAP (Generally Accepted Accounting Principles) revenue of $3.4 billion, an increase of 2.5 percent over FY 2017; adjusted operating earnings of ($170.6 million) were the best to date and an 11.9 percent improvement over the prior year. Capital investment of $1.46 billion was the highest in recent Amtrak history.

- Began implementation of a Safety Management System (SMS), a proactive, data-driven safety program used in many complex industries including aviation. Amtrak was the first major U.S. railroad to deploy SMS.

- Invested more than $51 million on Americans with Disabilities Act-related design and construction improvement projects at more than 100 locations nationwide.

- Improved the reliability and performance of infrastructure by completing the FY 2018 New York Penn Station renewal work on time and budget and by completing an overhaul of the Spuyten Duyvil Bridge linking Manhattan and mainland New York (via the Bronx).

- Made a $370 million investment in new equipment to double track infrastructure maintenance capacity on the Northeast Corridor (NEC).

- Reached new seven-year labor contracts with all unions providing fair wage increases for employees and medical plan cost control – good for employees and good for the long-term health of the company.

## Amtrak National Network in FY 2018



Long Distance
State Supported
Northeast Corridor
Suspended service

## Corporate Background

- Amtrak was created by Congress in 1970 to take over the majority of the intercity passenger rail services previously operated by private railroad companies in the United States. Those companies showed they had operated these services at a huge net loss for many years. National operations began on May 1, 1971.

- As defined by the U.S. Congress through the Passenger Rail Investment and Improvement Act of 2008 (PRIIA), Amtrak's mission is to "provide efficient and effective intercity passenger rail mobility consisting of high-quality service that is trip-time competitive with other intercity travel options."

- Amtrak is a federally chartered corporation, with the federal government as majority stockholder. The Amtrak Board of Directors is appointed by the President of the United States and confirmed by the U.S. Senate. Amtrak is operated as a for-profit company, rather than a public authority.

- The Amtrak Board of Directors appointed Richard Anderson president and chief executive officer effective Jan. 1, 2018. He is the eleventh executive to lead America's Railroad®. Mr. Anderson spent 25 years in the aviation industry, where he last held the position of executive chairman of the Delta Air Lines Board of Directors after serving as the airline's CEO from 2007 to 2016.

- The company has more than 20,000 employees. For the fourth year in a row, Amtrak in 2018 earned a spot on *Forbes* magazine's list of "America's Best Employers."

- Amtrak is on the web at Amtrak.com. For more information, the public may also visit us on Facebook, Twitter, Pinterest, Instagram, LinkedIn, Blog.Amtrak.com, GreatAmericanStations.com and History.Amtrak.com.

The 25 busiest stations in FY 2018
(Ridership equals boardings plus alightings)

| Station | Ridership |
|---|---|
| 1. New York, N.Y. (Penn Station) | 10,132,025 |
| 2. Washington, D.C. | 5,197,237 |
| 3. Philadelphia, Pa. (30th Street Station) | 4,471,992 |
| 4. Chicago, Ill. | 3,338,307 |
| 5. Los Angeles, Calif. | 1,717,405 |
| 6. Boston, Mass. (South Station) | 1,553,953 |
| 7. Sacramento, Calif. | 1,089,223 |
| 8. Baltimore, Md. | 1,041,232 |
| 9. Albany-Rensselaer, N.Y. | 800,368 |
| 10. Providence, R.I. | 766,492 |
| 11. BWI Thurgood Marshall Airport, Md. | 756,533 |
| 12. Newark, N.J. | 702,182 |
| 13. Wilmington, Del. | 702,150 |
| 14. San Diego, Calif. (Downtown) | 699,430 |
| 15. New Haven, Conn. (Union Station) | 697,603 |
| 16. Seattle, Wash. | 686,426 |
| 17. Boston, Mass. (Back Bay Station) | 683,016 |
| 18. Milwaukee, Wis. | 604,631 |
| 19. Emeryville, Calif. | 595,017 |
| 20. Portland, Ore. | 576,339 |
| 21. Lancaster, Pa. | 567,919 |
| 22. Harrisburg, Pa. | 512,642 |
| 23. Boston, Mass. (North Station) | 464,988 |
| 24. Route 128 (Westwood), Mass. | 446,221 |
| 25. Bakersfield, Calif. | 442,023 |

## Amtrak Network

- Amtrak operates a nationwide rail network, serving more than 500 destinations in 46 states, the District of Columbia, and three Canadian provinces, on more than 21,400 miles of routes. It is the nation's only high-speed intercity passenger rail provider, operating at speeds up to 150 mph (241 kph). Nearly half of trains operate at top speeds of 100 mph (160 kph) or greater.

- During FY 2018, Amtrak customers took 31.7 million trips. On an average day, customers made nearly 87,000 trips on more than 300 Amtrak trains.

- Amtrak offers approximately 150 Thruway routes that provide guaranteed connections to trains via buses, vans, ferries and other modes. This extends Amtrak service to more than 400 communities not served directly by Amtrak trains in 38 states and Canada. In FY 2018, customers made approximately 1.5 million Thruway trips (including Amtrak tickets sold for the NJ TRANSIT Atlantic City Line).

- Seventy-two percent of the miles traveled by Amtrak trains are on tracks owned by other railroads. Known as "host railroads," they range from large, publicly traded companies based in the U.S. or Canada, to state and local government agencies and small businesses. Amtrak pays these host railroads for use of their track and other resources needed to operate Amtrak trains, with incentives for on-time performance.

### The Six Largest Host Railroads for Amtrak Trains



- Amtrak is the only railroad in North America to maintain right-of-way for service at speeds in excess of 125 mph (201 kph), and its Engineering forces maintain more than 350 route-miles of track for 100+ mph (160+ kph) service.

- The company's growth over the past 10 years, especially on intercity corridors between 100-500 miles, indicates the



*Approximately 150 Thruway routes extend Amtrak service through guaranteed connections to trains via buses, vans, ferries and other modes.*

tremendous opportunity for developing a robust, nationwide passenger rail system focused on city pairs.

- When included among U.S. airlines, Amtrak ranks sixth in domestic passengers carried.* In the Northeast Corridor, Amtrak has a very strong position in many markets that were previously dominated by air carriers. *Oct. 2017-Sept. 2018.

  ‣ Amtrak carried more than three times as many riders between Washington, D.C., and New York City as all of the airlines combined (July 2017-June 2018).

  ‣ Amtrak carried more riders between New York City and Boston than all of the airlines combined (July 2017-June 2018).

- Amtrak's core values and strategic plan commit to incorporating sustainability into the company's operations and decision making, and Amtrak sets annual sustainability goals for fuel and electricity efficiency, greenhouse gas emission reductions and increased recycling.

## Financial Performance

- In FY 2018, Amtrak earned approximately $3.4 billion in GAAP revenue and incurred approximately $4.8 billion in capital and operating expense.* No country in the world operates a passenger rail system without some form of public support for capital costs and/or operating expenses. *Expense excludes: (1) certain non-cash items (depreciation, income tax expense, non-cash portion of pension and other post retirement employment benefits); and (2) GAAP income statement items reported with debt results or other grants (expense related to Inspector General's office, and interest expense, net).

- Amtrak recovered 94.9 percent of operating costs in FY 2018 with ticket sales, payments from state partners and agencies, and other operating revenue.

## Infrastructure Assets

- Amtrak owns and operates 363 miles of the 457-mile Northeast Corridor (NEC) spine between Washington and Boston.

- Amtrak-owned property outside the NEC spine includes:

  ‣ Harrisburg Line (also known as the Keystone Corridor): A 104.2-mile segment of up to 110 mph (177 kph) track between Philadelphia and Harrisburg, Pa.

  ‣ Michigan Line: A 95.6-mile segment of up to 110 mph (177 kph) track between Porter, Ind., and Kalamazoo, Mich.

  ‣ Springfield Line: A 60.5-mile segment of up to 110 mph (177 kph) track between New Haven, Conn., and Springfield, Mass.

- Amtrak also operates, maintains and dispatches a 135-mile right of way between Kalamazoo and Dearborn purchased by the state of Michigan in December 2012. The state and Amtrak have completed a series of infrastructure improvements, including replacement of worn track and upgrades to the train signaling and communication system, to further integrate this section of railroad with Amtrak's Michigan Line.

- Under a lease with CSX Transportation, Amtrak operates, maintains and dispatches approximately 94 miles of the Hudson Line—also known as the Empire Corridor—in New York state between Poughkeepsie and Hoffmans (near Schenectady).

- Amtrak owns 18 tunnels (consisting of 24 miles of track) and 1,414 bridges, primarily on the NEC spine and connecting corridors.



*Skilled employees at heavy maintenance facilities in Indiana and Delaware rebuild and overhaul a wide variety of cars and locomotives.*

- Amtrak owns three heavy maintenance facilities: Wilmington and Bear, Del., and Beech Grove, Ind. Other major maintenance facilities are located in Washington, D.C.; New York City and Rensselaer, N.Y.; Boston; Hialeah, Fla.; Chicago; New Orleans; Los Angeles and Oakland, Calif.; and Seattle.

- Amtrak is increasingly focused on managing climate change risks to operations and infrastructure to ensure resilience in operations after disruptive events.

## Northeast Corridor Services



**12.1 Million**
*Acela Express & Northeast Regional trips in FY 2018*

Washington, D.C. | Philadelphia, Pa.
New York City, N.Y. | Boston, Mass.

**9** commuter rail services operate on the NEC

**820,000***
Amtrak and commuter trips taken on the NEC on an average weekday
*Source: Northeast Corridor Commission

**79%** of the NEC spine is owned and maintained by Amtrak

Amtrak's Northeast Corridor (NEC) is the busiest railroad in North America, with approximately 2,200 Amtrak, commuter and freight trains operating over some portion of the Washington-Boston route each day.

- 18.3 million trips were made by Amtrak customers on the NEC in FY 2018. This included all Amtrak trains that traveled over some portion of the NEC spine (Washington-New York-Boston) and connecting corridors to Harrisburg, Pa., Springfield, Mass., Albany, N.Y., and Richmond, Va.

- Amtrak owns and operates 363 miles of the 457-mile NEC spine. Trains regularly reach speeds of 125-150 mph (201-241 kph). Two sections of the NEC are owned by others:

  ‣ The New York Metropolitan Transportation Authority (10 miles) and Connecticut Department of Transportation (46 miles) own 56 miles operated by Metro-North Railroad between New Rochelle, N.Y., and New Haven, Conn.

  ‣ The state of Massachusetts owns 38 miles between the Massachusetts/Rhode Island border and Boston that is operated and maintained by Amtrak.

- During FY 2018, Amtrak continued to modernize major station facilities on the NEC for improved operations and an enhanced customer experience. It advanced several projects as part of the Philadelphia 30th Street Station District Plan, including selecting firms that will compete to be Master Developer to update the station; continued design and construction to double passenger space in the Washington Union Station rail concourse; selected a master development team for Baltimore Penn Station; and moved forward with construction to expand New York Penn Station into the Moynihan Train Hall, which will become a boarding concourse for Amtrak and Long Island Rail Road customers.

- Amtrak and its partners also advanced planning and design of the Gateway Program, a comprehensive suite of strategic rail infrastructure improvements in the New York City area. It will increase track, tunnel, bridge and station capacity, eventually creating four mainline tracks between Newark, N.J., and New York Penn Station, including a new, two-track Hudson River Tunnel. As envisioned, the Gateway Program will provide increased resiliency on the NEC, added reliability, and additional capacity for future increases in commuter and intercity rail service. In 2018, the Gateway partners submitted to the U.S. DOT a Final Environmental Impact Statement and 30 percent Preliminary Engineering for the new Hudson River Tunnel. NJ TRANSIT and Amtrak also advanced early construction on the future Portal North Bridge that will span the Hackensack River in New Jersey.

- For the latest information on NEC projects and initiatives, visit nec.amtrak.com.

### Acela Express

- The *Acela Express*, Amtrak's premium service, is the fastest train in the Western Hemisphere, with a maximum speed of 150 mph (241 kph) on sections of its route between Boston and New Haven, Conn. Its top speed between New York City and Washington, D.C., is 135 mph (217 kph).

- The name "Acela" comes from a combination of the words "acceleration" and "excellence." More than 52.5 million passengers have traveled on the fleet of 20 *Acela Express* trainsets in the 18 years since revenue service began on Dec. 11, 2000. During FY 2018, customers took more than 3.4 million *Acela* trips and generated nearly $606 million in ticket revenue.

### Next-Generation *Acela Express*

- Amtrak announced in August 2016 that it contracted with Alstom to produce 28 state-of-the-art, fifth-generation high-speed trainsets that will replace the equipment used to provide



*The new Acela trainsets will feature spacious leather seats with integrated in-seat lighting and personal electrical outlets. Image: ALSTOM SA 2018. Design & Styling / AVELIA Liberty ™*

*Acela Express* service. With all of the trainsets expected to be in service on the NEC by the end of 2022, the new trains will provide world-class accommodations and amenities, along with a more comfortable ride. The manufacture of the trainsets will create 400 jobs in upstate New York; parts will come from more than 70 suppliers in 23 states, generating an additional 1,300 jobs. In 2018, the first power car bodyshell was completed, and the modern interiors were unveiled.

### State Supported Services



Amtrak receives funding from 18 states through 21 agencies for financial support of 29 short-distance routes (less than 750 miles). Section 209 of the Passenger Rail Investment and Improvement Act of 2008 (PRIIA) required Amtrak and its state partners to develop jointly a single, nationwide, and standardized cost-sharing methodology to charge states for State Supported intercity passenger rail service. Continued operation of State Supported routes is subject to annual operating agreements and state legislative appropriations according to Section 209.

States and other entities that provide funding and the routes on which service (indicated in parentheses) was state-supported during FY 2018:

### Northeast

- **Connecticut**: Springfield Shuttles and *Northeast Regional* (through) trains (New Haven-Springfield, Mass.), with Massachusetts; and *Vermonter* (New Haven-St. Albans, Vt.), with Massachusetts and Vermont.

## State Supported Ridership Over 1 Million



**State Supported service**

*Pacific Surfliner* (San Diego-Los Angeles-San Luis Obispo) — **2,946,239**

*Capitol Corridor* (San Jose-Oakland-Sacramento-Auburn) — **1,706,849**

*Keystone Service* (Harrisburg-Philadelphia) — **1,519,936**

*Empire Service/Maple Leaf* (New York-Albany-Buffalo-Toronto) — **1,517,194**

*San Joaquins* (Oakland/Sacramento-Bakersfield) — **1,078,707**

Ridership in millions (0.0 – 4.0)

## State Supported Ridership Over 500,000



**State Supported service**

*Hiawatha Service* (Chicago-Milwaukee) — **844,396**

*Amtrak Cascades* (Eugene-Portland-Seattle-Vancouver, B.C.) — **806,121**

*Lincoln Service* (Chicago-St. Louis) — **586,166**

*Downeaster* (Boston-Portland-Brunswick) — **540,038**

Ridership in millions (0.0 – 1.0)

- **Maine** (Northern New England Passenger Rail Authority): *Downeaster* service (Brunswick-Portland-Boston).

- **Massachusetts**: Springfield Shuttles and *Northeast Regional* (through) trains (Springfield-New Haven, Conn.), with Connecticut; and *Vermonter* (St. Albans, Vt.-New Haven, Conn.), with Connecticut and Vermont.

- **New York**: *Empire Service* (New York City-Albany-Buffalo-Niagara Falls); *Maple Leaf* (New York City-Niagara Falls-Toronto); *Adirondack* (New York City-Montreal); and *Ethan Allen Express* (New York City-Rutland, Vt.), with Vermont.

- **Pennsylvania**: *Keystone Service* (Harrisburg-Philadelphia) and *Pennsylvanian* (Philadelphia-Pittsburgh).

- **Vermont**: *Ethan Allen Express* (Rutland-Albany, N.Y.), with New York; and *Vermonter* (St. Albans-New Haven, Conn.), with Connecticut and Massachusetts.

### Central
- **Illinois**: *Hiawatha Service* (Chicago-Milwaukee), with Wisconsin; *Lincoln Service* (Chicago-St. Louis); *Illini & Saluki* (Chicago-Carbondale); and *Illinois Zephyr & Carl Sandburg* (Chicago-Quincy).

- **Indiana**: *Hoosier State* (Indianapolis-Chicago).

- **Michigan**: *Wolverine Service* (Pontiac-Detroit-Chicago); *Blue Water* (Port Huron-East Lansing-Chicago); and *Pere Marquette* (Grand Rapids-Chicago).

- **Missouri**: *Missouri River Runner* (St. Louis-Kansas City).

- **Wisconsin**: *Hiawatha Service* (Milwaukee-Chicago), with Illinois.

### Southern
- **North Carolina**: *Carolinian* (Charlotte-Raleigh-Washington, D.C.) and *Piedmont* service (Raleigh-Charlotte).

- **Oklahoma**: *Heartland Flyer* (Oklahoma City-Fort Worth, Texas), with Texas.

- **Texas**: *Heartland Flyer* (Fort Worth-Oklahoma City), with Oklahoma.

- **Virginia**: *Northeast Regional* (Washington, D.C.-Roanoke/Richmond/Newport News/Norfolk).

### West
- **California**: *Capitol Corridor* (San Jose-Sacramento-Auburn), managed by the Capitol Corridor Joint Powers Authority; *Pacific Surfliner* (San Luis Obispo-Los Angeles-San Diego), managed by the LOSSAN Joint Powers Authority; and *San Joaquins* (Sacramento/Oakland-Bakersfield), managed by the San Joaquin Joint Powers Authority. California also supports an extensive system of connecting Amtrak Thruway routes.

- **Oregon**: Amtrak Cascades (Eugene-Portland-Seattle-Vancouver, B.C.), with Washington.

- **Washington**: Amtrak Cascades (Eugene, Ore.-Portland-Seattle-Vancouver, B.C.), with Oregon.



*State, local and Amtrak officials gathered in Roanoke, Va., in October 2017 to cut the ribbon marking the start of daily* Northeast Regional *service to the city.*

## Service Enhancements and Equipment

- In FY 2018, Amtrak worked with numerous states to expand services. Together with Virginia, it extended *Northeast Regional* service to Roanoke, Va. With North Carolina, Amtrak added a third frequency to the *Piedmont* service, and with Connecticut it launched additional Amtrak service on the Springfield Line in conjunction with the commuter CT*rail* Hartford Line Service.

- Amtrak-operated, state-owned equipment* includes 173 rail passenger cars (California Car, Talgo and other types) and 65 diesel locomotives. Amtrak Cascades service primarily operates with six Talgo trainsets: Amtrak and the states of Oregon and Washington each own approximately one third of the 81-car Talgo fleet. In North Carolina, the *Piedmont* service operates with state-owned locomotives and passenger cars. In FY 2018, Amtrak continued placing state-owned Tier 4 Charger diesel locomotives into service; the total order includes 61 units. Amtrak state partners also have more than 100 state-owned railcars on order from Siemens. *As of Nov. 2018.

## Long Distance Services



**4.5 Million**
trips in FY 2018

**14%**
total Amtrak ridership

**15**
Long Distance train routes

**21%**
of total Amtrak ticket revenue

**18%**
of customers traveling to and/or from a rural station

Amtrak operates 15 Long Distance trains (more than 750 miles) whose routes range in length from 780 miles (*Capitol Limited*) to 2,728 miles (*Texas Eagle*).

- These trains provide the only rail service at nearly half of the stations in the Amtrak system and are the only Amtrak trains in 23 of the 46 states in the network.

- Amtrak is the only intercity passenger transportation service in an increasing number of communities that lack intercity bus and airline service.

## Contract Commuter Services

Amtrak is one of the largest operators of contract commuter services in North America; Amtrak provides either services and/or access to its tracks for 14 commuter agencies.

- Amtrak operates three commuter train services for state and regional authorities:
  ‣ Maryland Area Regional Commuter (MARC) Penn Line
  ‣ Metrolink (Southern California)
  ‣ Shore Line East (Connecticut)



*Amtrak provides maintenance-of-equipment services for CT*rail *Hartford Line trains, which operate over the Amtrak-owned railroad between New Haven, Conn., and Springfield, Mass. Image: Connecticut DOT.*

- Amtrak provides services of various types for six agencies:
  ‣ Central Florida Commuter Rail Commission (SunRail): Maintenance-of-equipment
  ‣ CT*rail* (Connecticut): Maintenance-of-equipment
  ‣ Maryland Area Regional Commuter (MARC): Maintenance-of-equipment
  ‣ Massachusetts Bay Transportation Authority (MBTA): Maintenance-of-way and dispatching
  ‣ Shore Line East (Connecticut): Maintenance-of-equipment
  ‣ Sound Transit (Washington): Maintenance-of-equipment

- Amtrak provides access to its tracks (and in some cases, other services) for 10 agencies:
  ‣ CT*rail* (Connecticut)
  ‣ Long Island Rail Road (New York)
  ‣ Maryland Area Regional Commuter (MARC) Penn Line
  ‣ NJ TRANSIT (New Jersey)
  ‣ Southeastern Pennsylvania Transportation Authority (SEPTA)
  ‣ Delaware Department of Transportation (DelDOT) (operated by SEPTA)
  ‣ Rhode Island Department of Transportation (RIDOT) (operated by MBTA)

▸ Shore Line East (Connecticut)

▸ Virginia Railway Express (VRE)

▸ Metra (Chicago area)

Connecticut, Delaware, Maryland, New Jersey, New York, Pennsylvania, Rhode Island and Virginia make payments to Amtrak through transit agencies or state transportation departments for use of Amtrak-owned NEC facilities by commuter trains. These agencies or states also provide other funding for the NEC, including capital funds for infrastructure and/or stations. Amtrak has agreements for access and/or maintenance where Amtrak trains operate over locally-owned portions of the NEC in Connecticut, Massachusetts and New York.

## Equipment and Trains



*Amtrak-operated, state-owned equipment includes new diesel Charger locomotives such as the one shown at right. Owned by the Washington State Department of Transportation, it wears the* Amtrak Cascades *paint scheme.*

• Active Amtrak-owned or leased passenger equipment* includes 20 *Acela Express*® high-speed trainsets (40 power cars and 120 passenger cars); 1,365 passenger cars including Amfleet®, Superliner®, Viewliner®, Horizon, Talgo and other types; 80 *Auto Train*® vehicle carriers; 23 non-powered control units; 249 road diesel locomotives; and 66 ACS-64 electric locomotives. In FY 2018, Amtrak continued receiving new single-level dining cars that are part of a larger 130-car order that also includes sleeping (pending) and baggage (delivered) cars. *As of Nov. 2018

• Amtrak awarded an $850 million contract to Siemens Mobility for 75 new Tier 4 passenger diesel locomotives and associated services. Tier 4 locomotives are more fuel efficient and have significantly reduced emissions. The units will offer the latest safety systems, have 4,400 hp and be capable of speeds up to 125 mph. The company also issued a Request for Information for passenger vehicles to replace the Amfleet I equipment used on *Northeast Regional* trains and several State Supported services.

• Amtrak is a leader in the installation of Positive Train Control (PTC), a safety technology designed to match train speed to track conditions for improved safety. As of January 1, 2019, all Amtrak-owned or controlled track had PTC in operation (except approximately

four miles of slow-speed track in the complex Chicago and Philadelphia terminal areas). Amtrak trains operated with PTC on approximately 15,800 miles of host railroad-owned track. An additional 5,000 miles of host railroad-owned track did not have PTC operating because the hosts were granted a PTC exemption from the Federal Railroad Administration or they established an alternative schedule for PTC implementation (approximately 1,500 of the 5,000 miles qualified for exemptions). Amtrak implemented operational risk mitigations across these 5,000 host railroad track miles to ensure continued safe operations.

• Even-numbered trains travel north and east, while odd-numbered trains travel south and west. Among the exceptions are the *Pacific Surfliner* trains, which use the opposite numbering system inherited from the Santa Fe Railway, some *Empire Service* trains, and the *Downeaster* trains.

## Customer Amenities

• Trains carrying 91 percent of all Amtrak customers offer complimentary AmtrakConnect Wi-Fi. In FY 2018, *Northeast Regional* trains received upgraded Wi-Fi equipment that allowed the average user to consume 28 percent more data. *Acela Express* also saw improvements to its Wi-Fi, allowing higher quality videos to be streamed across the system.

• Many routes offer carry-on and trainside checked bicycle service. Find more details and the latest information about our bikes program at Amtrak.com/bikes.

• On many routes, Amtrak offers customers the convenience of carrying small cats or dogs onboard. Find more details and the latest information about our pets program at Amtrak.com/pets.

• In FY 2018, Amtrak completed an extensive overhaul of the train interiors on about 450 Amfleet I cars used on more than a dozen services in the Northeast and Midwest; it also began a refresh of the 20 *Acela Express* trainsets. Work included installation of new seat cushions, carpeting and brighter LED lighting and focused on diverting old materials from landfills.



*Many Amtrak routes offer carry-on and trainside checked bicycle service.*

DECLARATION OF NANDAN M. JOSHI

EXHIBIT 6



AMERICAN ARBITRATION ASSOCIATION®

# The AAA's National Roster of Arbitrators

The use of arbitration has become a significant part of the justice system; the American Arbitration Association® (AAA®), a not-for-profit corporation founded in 1926, recognizes that its arbitrators undertake serious responsibilities and ethical obligations to the public as well as to the parties.

Parties to cases administered by the AAA can be assured that stringent standards of ethics and experience are applied to any member serving on the AAA's National Roster of Arbitrators. In this regard, Roster Members agree to serve in accordance with the Standards and Responsibilities for Members of the AAA Roster, the *Code of Ethics for Arbitrators in Commercial Disputes* and the *Code of Professional Responsibility for Arbitrators of Labor-Management Disputes*, as applicable.

The AAA's National Roster consists of highly accomplished and respected experts from the legal and business communities, including:

- Former federal and state judges.
- Attorneys with exceptional subject-matter expertise.
- Professionals who understand the essence of the dispute

Continuing educational programs are available, and in some cases required, which focus Roster Members on managing the dispute resolution process with fairness and skill, with an eye towards time-and cost-efficiency.

Each of the Commercial, Construction, Labor, Employment, and International panels has their own requirements. Specialty panels, including Aerospace, Aviation, and National Security; Construction Mega Project, Healthcare, Judicial and Large Cases, are curated with even more specialized criteria.

## AAA Administrative Fees, and Arbitrators' Fees and Expenses

The AAA maintains administrative fee schedules to compensate it for the cost of providing administrative services. No portion of the AAA's administrative fees are shared with arbitrators.

Arbitrators' fees are determined either by individual Roster Members or the applicable rules. The AAA typically collects deposits from the parties for distribution as arbitrator compensation on a pass-through basis, where any unexpended balances are returned to the parties at the conclusion of a case. The AAA administers a variety of caseloads and provides dispute resolution services within the United States and around the world, and unique rules and fee structures apply to some of that work. Roster Members are not AAA employees and have no ownership or financial interest in the AAA.

As a not for profit corporation, the AAA does not have individual owners or shareholders. To the extent surplus revenues exist, they are directed back to furthering the mission of the AAA.

DECLARATION OF NANDAN M. JOSHI

EXHIBIT 7

**NATIONAL RAILROAD PASSENGER CORPORATION**
1 Massachusetts Avenue, NW, Washington, DC 20001
Tel 202.906.3670   Fax 202.906.2850



**Richard H. Anderson**
President and Chief Executive Officer

November 25, 2019


The Honorable Peter DeFazio
Chairman, Committee on Transportation
    and Infrastructure
U.S. House of Representatives
2165 Rayburn House Office Building
Washington, DC 20515

The Honorable Sam Graves
Ranking Member, Committee on Transportation
    and Infrastructure
U.S. House of Representatives
2164 Rayburn House Office Building
Washington, DC 20515

The Honorable Daniel Lipinski
Chairman, Subcommittee on Railroads,
    Pipelines, and Hazardous Materials
U.S. House of Representatives
2165 Rayburn House Office Building
Washington, DC 20515

The Honorable Rick Crawford
Ranking Member, Subcommittee on Railroads,
    Pipelines, and Hazardous Materials
U.S. House of Representatives
2164 Rayburn House Office Building
Washington, DC 20515


Dear Chairmen DeFazio and Lipinski and Ranking Members Graves and Crawford:

Recently, representatives of lobbying groups funded by trial lawyers have made false and misleading statements to the media about Amtrak's intent in adopting the passenger claims arbitration program we implemented nearly a year ago.  I want to provide you with an accurate and complete account of our reasons for adopting mutual arbitration, and to describe the attributes of this program that make it a bilateral, fair and efficient process for resolution of disputes by an independent arbitrator and for awarding a passenger who proves her claim all of the relief permitted under applicable law, without having to endure years of costly litigation in court.

**Background**

I am enclosing tables that show, for each fiscal year from 2015 through 2019, (i) the total number of passenger injury claims made against Amtrak, (ii) the percentage of those claims handled and resolved directly with claimants without litigation, (iii) Amtrak's outside counsel costs for passenger injury claims, and (iv) comparative disposition times for directly resolved claims and disputed claims that were litigated in court.  As indicated in the charts, more than 95 percent of claims resolved during this period were



*The Honorable Peter DeFazio*
*The Honorable Sam Graves*
*The Honorable Daniel Lipinski*
*The Honorable Rick Crawford*
*November 25, 2019*
*Page 2*

resolved without litigation, and the average time required for the resolution of claims litigated in court was between 29 and 43 months.

**Amtrak's Reasons for Adopting Arbitration:**
Contrary to what some have recently asserted or implied, Amtrak did not develop its arbitration program for passenger claims in order to disadvantage passengers or escape liability for accidents.  On the contrary, the arbitration program is consistent with other major Amtrak initiatives to improve the overall customer experience, and Amtrak adopted it for two simple reasons: to expedite resolution of claims and to reduce unnecessary litigation costs.

First, Amtrak's arbitration program provides a much quicker resolution of claims and much faster compensation to injured parties than court litigation, while retaining most important aspects and protections of the civil litigation system: convenient venues throughout the country; legal representation; an independent decisionmaker; authorization for appropriate discovery; and the ability of a prevailing claimant to be awarded damages and all other relief available under applicable law.  The major difference is that arbitration provides a resolution in less time – generally well within a year of filing – by avoiding unnecessary discovery and other time-consuming proceedings, and the often years-long wait for a trial date on overcrowded court dockets.  "Agreements to arbitrate are desirable precisely because they trade the procedures of the federal courts for the simplicity, informality, and expedition of arbitration."  *Shelton v. The Ritz Carlton Hotel Co., LLC*, 550 F. Supp. 2d 74, 81 (D.D.C. 2008) (internal citation omitted).

Second, in its oversight of Amtrak, Congress has directed Amtrak to "use its best business judgment in acting to minimize United States Government subsidies."  Arbitration achieves that aim by streamlining the scope, and thus the expense, of the traditional civil litigation proceeding.  The only beneficiaries of protracted and extraordinarily expensive court litigation are the lawyers, whose fee agreements can consume up to 40 percent of a successful claimant's award.

The United States Supreme Court has consistently upheld the enforceability of arbitration agreements, in accordance with the Federal Arbitration Act.  In a *per curiam* decision, *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530 (2012), the Court stated as follows:

> The FAA provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The statute's text includes no exception for personal-injury or wrongful-death claims.

*The Honorable Peter DeFazio*
*The Honorable Sam Graves*
*The Honorable Daniel Lipinski*
*The Honorable Rick Crawford*
*November 25, 2019*
*Page 3*



It "requires courts to enforce the bargain of the parties to arbitrate." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).  It "reflects an emphatic federal policy in favor of arbitral dispute resolution" (citations omitted).

Amtrak's arbitration program has been carefully crafted to meet the standards for such programs set forth in Supreme Court and other judicial rulings, proving false the vague assertions that our program violates passengers' constitutional rights.  Indeed, the program goes far beyond those standards in order to provide a fair, flexible, and easy-to-utilize process for our passengers.  Contrary to what one critic has said, the program is demonstrably not "anti-consumer."  In fact, it seems that some of the questions and concerns about Amtrak's program may be coming from recollections of arbitration programs rolled out years ago in certain industries, which did contain a variety of anti-consumer features, like limited venues, arbitrators selected by the company, restricted damages, or shortened time periods for filing.  In contrast, Amtrak's mutual arbitration program avoids those one-sided features.

Significant attributes of Amtrak's program include the following:
1) The arbitration agreement is prominently and clearly highlighted during the ticketing transaction, so passengers are on clear notice of it when purchasing Amtrak travel.  Passengers booking tickets online must click a box that specifically references the arbitration agreement and provides a link to the terms and conditions of travel, including the arbitration agreement.  The arbitration agreement is also available on Amtrak's website, easily accessible for anyone to review, even before they are ready to buy a ticket.  Thus, there is no "fine print" or "hide the ball" effort to conceal or mislead our customers.  Indeed, it makes no sense for some to criticize the arbitration agreement for being "detailed," when that detail is critical for passengers to understand exactly what the arbitration program involves.
2) Arbitration is conducted by the American Arbitration Association (AAA), a non-profit organization that has been around for almost 100 years and has literally written the (rule)book on arbitration.  As it notes on its website (www.adr.org), "AAA panels comprise distinguished judges as well as leaders in the legal and business communities with industry-specific knowledge and expertise.  Arbitrators are required to adhere to Codes of Ethics developed by the AAA and the American Bar Association (ABA)."  Thus, assertions that the arbitrations would be controlled by Amtrak are patently false.
3) Arbitration venues are available throughout the country, so that the arbitration can be held at a location convenient to the passenger.
4) The arbitrator is selected by mutual agreement between the passenger and Amtrak.
5) Amtrak pays most of the costs of the arbitration proceeding – a minimum of $4,700 for a simple case – with passenger claimants paying a filing fee of only $200, which is comparable or lower than most court filing fees.



*The Honorable Peter DeFazio*
*The Honorable Sam Graves*
*The Honorable Daniel Lipinski*
*The Honorable Rick Crawford*
*November 25, 2019*
*Page 4*

6) Passengers may of course elect to be represented by an attorney.
7) The arbitrator has the authority to customize the scope of discovery to align with the nature and complexity of the claim.
8) The arbitrator has the authority to award all relief available under applicable law in a court proceeding, including punitive damages (as warranted and available).
9) Cases that proceed through arbitrations can be settled at any point before, during, or after the arbitration proceeding, just like a court proceeding.  Therefore, it is simply not true, as one recent article stated, that settlements of passenger claims arising out of major accidents will no longer be possible under the arbitration program.
10) The bottom-line benefits for passengers are a faster, streamlined, efficient and less costly process to resolve a disputed claim and obtain full relief as the proven facts warrant under the law.  (We expect most rulings within seven to nine months.)  Arbitration is a better approach than the significantly more expansive and expensive civil litigation process with all sorts of unnecessary discovery and motion practice subject to little judicial oversight, taking two to five years or longer to reach resolution, not including appeals.  Why should an Amtrak passenger have to go through that more protracted and expensive process, and be so delayed in obtaining the relief to which she or he is found to be entitled?

This focus on providing quick relief to injured passengers is not just lip service, but is reflective of our values, which are demonstrated in our response to any passenger claim and are most vividly illustrated in the personal injury context.  When Amtrak passengers are injured on our services, we are fully committed to do everything we can as quickly as we can to do the right thing for them. In the context of bad accidents with tragic results – loss of life and significant injuries – we have paid hospital and other bills for medical care, mobilized passenger family liaisons and nurse care managers, absorbed costs related to passengers' family travel and dislocation, and, when clearly the right thing to do, admitted liability for compensatory damages to expedite claims resolution for injured passengers, including fatally injured passengers and their families.  Bottom line, when accidents of any kind occur, we have shown that we want to make it as right as we can for passengers as efficiently and fairly as we can.

Amtrak has a fundamental commitment to Congress to be a careful steward of taxpayer funds. Amtrak spends roughly $2-$3 million annually – some $11 million over the last five years – for outside counsel to represent the Company with respect to passenger claims.  We believe arbitrating disputed passenger claims under our policy will reduce those costs significantly; that is money that can then be spent in safety programs and other passenger service and care programs.

*The Honorable Peter DeFazio*
*The Honorable Sam Graves*
*The Honorable Daniel Lipinski*
*The Honorable Rick Crawford*
*November 25, 2019*
*Page 5*



I hope the above information about Amtrak's passenger claims arbitration program corrects the materially inaccurate and misleading narrative reported in some media statements and addresses and resolves any concerns you may have.  Please let me know if you would like any additional information about it.

Sincerely,

Richard Anderson
*President & Chief Executive Officer*

Enclosures

**Amtrak Passenger Injury Claims**

**Passenger Injury Claims, Per Fiscal Year**

| Fiscal Year | # Passenger Claims Opened | # Passenger Claims Resolved* | # Passenger Claims Resolved Without Lawsuit Filed | # Passenger Claims Resolved After Lawsuit Filed | % Passenger Claims Resolved Without Litigation |
|---|---|---|---|---|---|
| FY15 | 2782 | 2531 | 2448 | 83 | 97% |
| FY16 | 2709 | 2661 | 2575 | 86 | 97% |
| FY17 | 2442 | 2757 | 2549 | 208 | 92% |
| FY18 | 2736 | 2550 | 2458 | 92 | 96% |
| FY19 | 2516 | 2368 | 2253 | 115 | 95% |

*Irrespective of the date the claim was presented; "Resolved" means closed via any type of resolution, including settlement, no-pay, withdrawal of claim, or verdict

**Legal Fees (Resolved Claims)**

| Fiscal Year | Total |
|---|---|
| FY15 | $ 2,228,713 |
| FY16 | $ 1,785,768 |
| FY17 | $ 2,276,364 |
| FY18 | $ 1,540,606 |
| FY19 | $ 3,369,883 |
| Total | $ 11,201,334 |

**Time to Claim Resolution, Per Fiscal Year in Which Claim Was Resolved**

| Fiscal Year | Average Number of Days Open for Claims Resolved Without Lawsuit ("Nonlitigated") | Average Number of Days Open for Claims Resolved After Lawsuit Filed ("Litigated") | Difference in Average Days Open Between Litigated and Nonlitigated | Comparative Time to Resolution, Non-Litigated Claims to Litigated Claims |
|---|---|---|---|---|
| FY15 | 340 | 1188 | 849 | 29% |
| FY16 | 302 | 966 | 664 | 31% |
| FY17 | 339 | 873 | 535 | 39% |
| FY18 | 340 | 1312 | 972 | 26% |
| FY19 | 297 | 1026 | 730 | 29% |